## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

———————————————————————— X

LINDA F. WHITE, on Behalf of Herself and:
a Class of Persons Similarly Situated,    :

                 Plaintiff,    :

    v.    :

MARSHALL & ILSLEY CORPORATION;:
M&I   RETIREMENT   INVESTMENT:
COMMITTEE;  PAUL   J.   RENARD;:
DENNIS R SALENTINE; JOHN DOES 1-:
10, AND; DENNIS J. KUESTER,    :

                Defendants.    :

———————————————————————— X

CLASS ACTION

COMPLAINT FOR BREACH OF
FIDUCIARY DUTY AND VIOLATION
OF ERISA DISCLOSURE
REQUIREMENTS

JURY TRIAL DEMANDED

1

## COMPLAINT

Plaintiff Linda F. White ("Plaintiff"), on behalf of herself, (i) the M&I Retirement Program; (ii) the North Star Financial 401(k) Plan; (iii) the Missouri State Bank and Trust Retirement Savings Plan; and (iv) the NYCE Corporation Employees Tax Deferred Savings Plan (collectively the "Plans"), and to the extent necessary, a Class of similarly situated participants and beneficiaries of the Plans ("Participants"), by her attorneys, alleges the following for her Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based upon personal knowledge. Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1.      Plaintiff, who was a Participant in the M&I Retirement Program during time periods relevant to this Complaint, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), on behalf of the Plans, and to the extent necessary, on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts held shares of common stock of Marshall & Ilsley Corporation hereinafter ("M&I" or the "Company") at any time from November 10, 2006 to and including December 17, 2009 (the "Class Period").[1] Plaintiff brings this action on behalf of the Plans and the Class pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3). As more fully set forth below, Defendants breached their fiduciary duties

---

[1] The Plans hold certain of their assets through a "Master Trust." The Master Trust holds certain of the Plans' investment assets. As of December 31, 2008, the M&I Master Trust held 7,594,666 shares of common stock of M&I through the M&I Sock Fund.

to the Participants, including those fiduciary duties set forth in ERISA Section 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550.

2.     Specifically, Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to her, the Plans and the proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) offering the Fund as a Plan investment option; (2) continuing to invest Plan assets in the M&I Stock Fund ("Fund")[2] and Fund assets in M&I common stock when it was imprudent to do so; (3) failing to provide complete and accurate information to Plan Participants regarding the Company' financial condition and the prudence of investing in Company stock; and (4) maintaining the Plans' pre-existing heavy investment in the Fund when Company stock was no longer a prudent investment for the Plans. These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement (see ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY")).

---

[2]     The Fund's fact sheet, *available at* https://www.hr.micorp.com/mi2/mi_benefits/mi_retirement/fundfact.html (last downloaded March 23, 2010) states that

> The Fund was created on November 1, 2007 as a result of the spin-off transaction involving M&I and Metavante Technologies, Inc. Prior to November 1, 2007, qualified retirement plans sponsored by M&I offered a similar fund, the Old M&I Stock Fund. Due to the spin-off transaction, the Old M&I Stock Fund was closed. Two new funds were created from the common stock of M&I and Metavante Technologies, Inc. issued by the spin-off transaction. This Fund originates from shares of M&I issued to the Old M&I Stock Fund. Fund performance on this fact sheet is reflected for periods after November 1, 2007.

The "Fund" as described herein includes both the Old M&I Stock Fund and the New M&I Stock Fund.

3. Count II alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering the Fund as an investment option, investing Plan assets in the Fund when it was no longer prudent to do so, and investing Fund assets in M&I common stock.

4. Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plans' assets in M&I equity throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company had strayed far from its core competencies into riskier regions, and there the Company made risky loans in an attempt to boost profits; (b) the Company was experiencing significant net loss and credit-quality deteriorations; (c) there were serious concerns about the Company's capital levels and seemingly ever-increasing reserves during the Class Period; (d) the Company lacked a reasonable basis for its positive statements about its lending, business, operations and earnings prospects; (e) the Company's long-developed reputation for making solid loans suffered significantly as a result of the Company's imprudent lending practices; (f) the Company's debt and equity were downgraded repeatedly during the Class Period; (g) the above-described undisclosed serious problems faced by the Company led to, *inter alia*, the artificial inflation of the price of M&I common stock and created dire financial circumstances for the Company; and (h) heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plans, and consequently, to its Participants. Nevertheless, Plan fiduciaries continued to allow the Plans and the Plans' Participants to hold and purchase Fund shares in their individual accounts –and it in fact appears

4

that the Plans' fiduciaries did little, if anything, to protect their wards—as the Company's problems snowballed and as the Company's stock price plummeted.

5.       This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Moreover, to the extent necessary, Plaintiff brings this as a class action on behalf of the Plans and all Participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

6.       Plaintiff's claims arise under and pursuant to ERISA Section 502, 29 U.S.C. § 1132.

7.       This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.       Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plans were administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

9.       Plaintiff Linda F. White is a resident of the State of Florida. Plaintiff was a Plan participant and maintained an investment in the Fund in her individual account during the Class Period.

10.       Defendant Marshall & Ilsley Corporation is a bank holding company. M&I provides diversified financial services to a variety of corporate, institutional, government and individual customers. M&I's principal assets are the stock of its bank and nonbank subsidiaries, which, as of February 15, 2009, consisted of five bank and trust subsidiaries and a number of companies engaged in businesses that are closely-related or incidental to the business of banking.

5

M&I provides its subsidiaries with financial and managerial assistance such as budgeting, tax planning, auditing, compliance assistance, asset and liability management, investment administration and portfolio planning, business development, advertising and human resources management. M&I has four segments: Commercial Banking, Community Banking, Wealth Management and Treasury. The Company is incorporated in Wisconsin and maintains its principal place of business at 770 North Water Street, Milwaukee, Wisconsin 53202.

11.    At all times relevant to this Complaint, Defendant M&I Retirement Investment Committee (the "Investment Committee") managed and administered the Plans and the assets of the Plans and acted as a fiduciary with respect to the Plans. The Plans' governing Plan document, as filed with the SEC as an attachment to a Form S-8 on or about December 21, 2001 (the "Plan Document")[3] states that the Investment Committee is a named fiduciary of the Plan and is responsible for selecting Plan investment options, including the Fund. At all times relevant to this Complaint, the Investment Committee managed and administered the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan. Because the Plan's investment options and interest in the Fund were managed through the Master Trust, upon information and belief, the Investment Committee had the same duties concerning the Plans other than the M&I Retirement Program.

12.    Defendant Paul J. Renard ("Renard") signed the M&I Retirement Program Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2008, which was filed with the SEC on June 23, 2009 (the "2009 11-K") in his capacity as Senior Vice President, Director of Human Resources of Marshall & Ilsley Corporation and a Member of the Committee of the M&I Retirement Program. Renard was a Plan fiduciary during the Class Period.

---

[3] *Available at* http://www.secinfo.com/dR7P7.4f8Gs.d.htm#1stPage.

13. Defendant Dennis R. Salentine ("Salentine") signed the M&I Retirement Program Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for fiscal year 2006 (the "2006 5500") on August 13, 2007, as the plan administrator. Defendant Salentine was a fiduciary of the Plan during the Class period.

14. John Does 1-10 were the individual members of the Investment Committee and members of any other committee(s) which administered the Plans. The identity of the members of the Committee, and of any other committee(s) which was or were responsible for carrying out the provisions of the Plan, is currently not known. Upon information and belief, John Does 1-10 are senior officers of the Company who knew or should have known the facts alleged herein.

15. Defendant Dennis J. Kuester ("Kuester") has been Chairman of the Board of M&I since January 2005, was Chief Executive Officer of the Company from January 2002 to April 2007, and President of the Company from 1987 to 2005. He has been a Director of M&I since February 1994. He was also Chairman of the Board and Chief Executive Officer of M&I subsidiary Marshall & Ilsley Bank (the "Bank") from October 2001 to April 2007, President of the Bank from January 1989 to October 2001 and a Director of the Bank since 1989. Pursuant to the Plan Document, Kuester, as Chariman of M&I, was responsible for appointing the members of the Investment Committee.

## CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action on her own behalf and, to the extent necessary, as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts the Plans held shares of M&I common stock (including in the form of

7

M&I common stock or units of the M&I Stock Fund (the "Fund")) at any time from November 10, 2006 through and including December 17, 2009 (the "Class").

17.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at minimum, thousands of members of the Class. For example, the M&I Retirement Program Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for fiscal year 2007 (dated September 30, 2008) lists 20,273 Plan participants at the start of calendar year 2007 and 14,967 Plan participants at the end of calendar year 2007.

18.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants were fiduciaries;

(b)     Whether Defendants breached their fiduciary duties;

(c)     Whether the Plans and the Participants were injured by such breaches; and

(d)     Whether the Class is entitled to damages and injunctive relief.

19.     Plaintiff's claims are typical of the claims of the other members of the Class, as the Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

20.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other class members.

8

21.     Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## DESCRIPTION OF THE PLANS

22.     At all times relevant to this Complaint, the Plans were employee benefit plans within the meaning of ERISA Section§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

23.     At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

24.     At all times relevant to this Complaint, the Plans through the Master Trust provided a number of different options for investment of the Plans' assets, including the Fund.

25.     At all times relevant to this Complaint, Participants were allowed to direct the Plans to purchase investments from among the investment options available under the Plans and allocate them to their individual accounts, subject to a 30% limitation for the Fund.

26.     For example, the M&I Retirement Program's 2008 Form 11-K Annual Report states, among other things:

9

## 1. Description of the Plan

The M&I Retirement Program (the "Plan") is a defined contribution plan which is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Marshall & Ilsley Corporation (the "Corporation") is the administrator of the Plan and the Marshall & Ilsley Trust Company (the "Trustee"), a subsidiary of the Corporation, is the trustee and recordkeeper of the Plan. The Trustee holds all investments of the Plan.

The following descriptions of the Plan are provided for general information purposes only. More complete information regarding the Plan's provisions may be found in the plan document.

\* \* \*

**Eligibility** — All employees of the Corporation and subsidiaries who have completed one year of continuous service, as defined by the Plan, are eligible to receive employer profit sharing contributions, excluding interns, co-op and in-roads employees. Eligible employees may elect to make deferrals upon the date of hire.

**Contributions** — Upon election to participate, the participant designates under a salary reduction agreement the amount of the pre-tax annual contribution (0% to 50% of compensation, as defined), subject to Internal Revenue Service (IRS) limitations. Employees may change the amount of the pre-tax annual contribution as often as they wish. Participants who will reach at least age 50 by the end of the plan year have the ability to make 401(k) catch-up contributions, subject to IRS limitations. The Corporation will make a guaranteed matching contribution of 50%, up to a maximum of 6% of the participant's compensation, following one year of service. Effective beginning in the 2006 plan year, participants can elect to make post-tax contributions to the Plan through Roth 401(k) contributions.

Corporation profit sharing contributions consist of both guaranteed and discretionary contributions. Percentages that are discretionary are determined by the Board of Directors on an annual basis. The Corporation made profit sharing contributions of 2% guaranteed, 4% discretionary and 2% guaranteed, 6% discretionary of eligible compensation during the years ended December 31, 2008 and 2007, respectively.

\* \* \*

> **Investment Options** — Participants may direct their pre-tax 401(k), match, Roth 401(k), rollover and Corporation profit sharing contributions and any related earnings thereon into twenty-one investment options *designated by the Plan's investment committee* in 1% increments. Participants are able to change their investment elections daily. Participants who are invested in the Metavante Stock Fund are able to diversify their investment out of the fund, but are not able to direct new contributions into it.

(emphasis added).

27.     Company matching contributions were automatically invested 100% in the Fund during the Class Period. See SPD, *available at* https://www.hr.micorp.com/mi2/mi_benefits/ mi_retirement/summary.html, last downloaded March 23, 2010).

28.     The 2008 11-K of the M&I Retirement Program Plan also represents that approximately $ 105,123,262 of the Plan's total investments of $ 652,609,270, or approximately 16.1% of the assets of the Plan, were invested in M&I common stock as of December 31, 2008.

## ADMINISTRATION OF THE PLANS

29.     Defendants, as fiduciaries of the Plans, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101, 29 U.S.C. § 1021, requires a plan's administrator to furnish a Summary Plan Description ("SPD") to the plan's participants. ERISA Section 102, 29 U.S.C. § 1022, provides that an SPD must apprise participants of their rights and obligations under the plan.  In addition, every person who held M&I common stock in a Plan account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of M&I.

30.     Defendants had a duty to review the Plans' investment policies and the selection and the performance of investment alternatives offered under the Plans.  There was no requirement that any assets of the Plans be invested in Company stock or that Company stock be continued as an investment alternative.

31.     Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plans.

32.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plans as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plans or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plans.

33.     Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan assets allocated to their accounts. For example, Section 16.02 of the M&I Retirement Program Plan Document states, in relevant part, that "The Investment Committee may provide for the creation of one or more investment funds as provided in the Trust Agreement (the *'Investment Funds'*), including an M&I Fund as described in the Trust Agreement." (emphasis in original). The M&I Fund was a Plan investment option consisting principally of M&I common stock, which the M&I Retirement Program Plan Document gives the Plan's fiduciaries unfettered discretion in deciding whether or not to allow to be among the Plan's Investment Funds. Moreover, upon information and belief, the Investment Committee was responsible for determining the amount of M&I common stock purchased and held by the Fund. Upon information and belief, because the Fund was offered and managed through the Trust, the Investment Committee had the same duties concerning the other Plans.

34.     Kuester had the duty to appoint, monitor and inform Investment Committee Members. Kuester also had the duty to inform Committee Members about the true financial and

operating condition of the Company. Liability is only asserted against Kuester for such periods of time as Kuester acted as a fiduciary with respect to the Plans.

35.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## M&I COMMON STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS

36.     During the Class Period, the market price of M&I common stock was artificially inflated due to the concealment of M&I's true financial and operating condition as described herein. Throughout the Class Period, M&I common stock was not a prudent investment for the Participants' individual retirement accounts under the Plans because it was both artificially inflated and unduly risky. The Fund's fact sheet, avialble at https://www.hr.micorp.com/mi2/ mi_benefits/mi_retirement/fundfact.html (last downloaded March 23, 2010) shows that returns for investing in the Fund were -59.24%, -44.53%, and -24.03% in calendar years 2009, 2008, and 2007, respectively.

37.     M&I was viewed early last decade by banking industry analysts as one of the best at making solid loans, and, as a result, had developed one of the industry's best reputations for booking and keeping quality loans. During the Class Period, M&I gambled its reputation in an attempt to expand growth. The gamble was a move that would ultimately decimate Plaintiff's and the Class's retirement savings in their Plan accounts.

38.     In November 2005, M&I announced a definitive agreement to merge with Gold Banc Corporation, Inc. The merger gave M&I a significant presence in Florida with approximately twelve branches, and spread M&I from its traditional base in Wisconsin to Florida, Kansas, and Missouri. Of the merger, Defendant Kuester stated that "Gold Bank has developed a significant commercial base in strong growth markets. Through this merger, M&I

will have the opportunity to expand on that growth by offering additional products and services to consumers in the Gold Bank market." This aggressive expansion from the Company's base predictably led to increased risk borne by the Plans and, ultimately, to catastrophic results.

39.    However, by November 10, 2006, the start of the Class Period, cracks in the Company's reputation for making prudent loans were beginning to show.  On November 10, 2006, *American Banker* reported in an article entitled "Real Estate Slowdown Has M&I Cautious; Company overview" that:

> Marshall & Ilsley Corp.'s chief financial officer, Gregory Smith, said the real estate slowdown has prompted the $55 billion-asset Milwaukee company to take a *more pessimistic outlook for credit quality.*
>
> "We're watching the housing market very carefully, and as we watch the housing market, we think the slowdown could be impacting the performance of some of the underlying credits," Mr. Smith said in an interview Thursday.
>
> On his company's earnings conference call last month, he had said M&I expected nonperforming loans "in the 50 basis points to 60 basis points range" in the future. But at a conference Thursday, he said, "We are thinking these levels of nonperforming assets *could go up to the 65 to 75 basis-point range over time."*
>
> In September housing starts plunged 18% from a year earlier, to 1.77 million, according to a Census Bureau report issued Oct. 18.
>
> "We can see where this might wind up causing some stress for our ultimate borrowers," Mr. Smith said in the interview.
>
> In particular, he said he is concerned that the slowdown may be putting pressure on residential builders and could lead to an increase in nonperforming loans. However, he stopped short of predicting an increase in chargeoffs. "For me, that is probably the most important part of this."
>
> *Construction loans currently make up about 12% of the company's loan portfolio.*
>
> During third-quarter earnings presentations, several Midwestern banking companies cited a deterioration in credit quality. Fifth

Third Bancorp of Cincinnati cited a couple of nonperforming credits, one of them to the auto sector, while Comerica Inc. of Detroit reported some erosion but said that it was not limited to one sector.

At a presentation before his interview Thursday at the Fox-Pitt Kelton Financial Services Conference in Champions Gate, Fla., Mr. Smith said that M&I's nonperforming assets would certainly rise from 0.53% of loans in the third quarter. He said acquisitions made in the second quarter -- Gold Banc Corp. Inc. of Leawood, Kan., and Trustcorp Financial Inc. of St. Louis -- contributed to a 9-basis-point deterioration in nonperformers in the third quarter from a year earlier.

*"Clearly, given the credit environment we are in, we expect these levels to go up," he said.*

40.     On December 4, 2006, the Company and United Heritage Bankshares of Florida, Inc. ("United Heritage") announced they had signed a definitive merger agreement. Defendant Kuester stated: "As we've been building our Florida franchise, our team identified the Orlando market and specifically United Heritage as a key priority for expansion." The Company also said that it plans to roll out some of its products to customers of United Heritage and expand the bank's territory in central Florida.

41.     On January 16, 2007, the Company reported "2006 fourth quarter core operating income of $218.4 million, or $0.84 per share, as compared to $177.5 million, or $0.74 per share, in the fourth quarter of 2005, an increase of 23.1%, or 13.5% on a per share basis. The Corporation reported 2006 fourth quarter net income of $205.4 million, or $0.79 per share." But these profits were largely illusory and, in fact, began to show cause for concern. Despite posting profits for the quarter, M&I also posted increases in nonperforming loans: M&I increased its loan-loss provisions by about 40 percent, to $18 million from $13 million for fourth-quarter 2005.

42.     In response to the Company's earnings release, also on January 16, 2007, *MarketWatch* noted that:

> Marshall & Ilsley (mi) fell "a penny or two short" of Prudential Equity Group's earnings forecast of 81 cents a share by reporting core operating earnings of 79 cents a share, analyst Robert C. Rutschow said in a note to clients Tuesday. "*Of particular concern was a 17% increase in non-performing assets, which was largely attributable to weakness in both commercial and residential real estate,*" Rutschow said. He said the company's weaker margin and worsening credit quality may mean, "plain vanilla mid-cap banks (those without big fee businesses like M&I's processing) may see tougher sledding ahead." Marshall & Ilsley shares fell 1.2% to $47.48 in recent trades. [emphasis added]

*The Wall Street Journal* similarly noted on January 17, 2007, that "Wells Fargo, U.S. Bancorp and Marshall & Ilsley posted higher profits, but increases in bad loans at the banks deepened worries about credit quality.

43.     On July 18, 2007, the Company announced its profits for the second quarter of 2007. While profits climbed 16 percent as the bank attracted more deposits and used them to issue more loans, and while the Company reported second-quarter net income of $220.3 million, or 83 cents per share, compared with profit of $190.5 million, or 74 cents per share, in the second quarter of 2006, the Company's profit margin from lending narrowed by nine basis points and the Company missed analyst expectations because of a boost in its loan-loss provisions (among other things, the Company set aside $26 million anticipating some borrowers will be unable to repay their debts, compared with an $11 million reserve in the second quarter of the previous year and the Company wrote off $23.6 million in loans during the quarter, compared with $9.9 million in the year-ago quarter).

44.     On July 26, 2007, M&I stock fell almost 4.3%, losing $1.85 to close at $41.43 on concerns about the quality of its loans and the general housing market slump.

45.     On October 17, 2007, M&I posted an 8% drop in net income in the third quarter as the bank increased its reserves for potentially bad debt and took a charge for costs related to the pending spin-off of its technology subsidiary. The Company said it set aside an additional $41.5 million for potential loan losses in the quarter, up from $10.3 million in the third quarter last year. Chief Financial Officer Greg Smith said the Company "believe[s] it is possible we will see future increases in nonperforming loans."

46.     An October 18, 2007 article in the Milwaukee Journal Sentinel (Wisconsin), entitled "M&I posts drop in net income; Bank raises loan reserves, takes spin-off charge," discussing the Company's earnings release, reported as follows:

> M&I, like most banks, said the need to boost its loan-loss reserve stemmed from the housing slowdown. Tardy loans are concentrated in commercial and residential construction-related portfolios, the bank said.

> Although M&I has a reputation among regional banks for having a high-quality loan portfolio, it likely has acquired some shaky loans with the banks it has bought in its expansion beyond Wisconsin over the last few years, said Jon C. Bruss, chief executive of Fortress Partners Capital Management in Hartland.

47.     On December 11, 2007, the Company was lowered to "underperform" at KBW and the per share price of Company stock fell by over 4%. Similarly, on December 14, 2007, Bank of America Securities analyst Kenneth Usdin downgraded shares of M&I to "neutral" from "buy" on worries over its credit exposure. "Connected to our negative view on the regional bank group, we are incrementally concerned with revenue growth and credit pressures at M&I," the analyst wrote in a report to clients, adding the stock could trade closer to its banking peers, rather than a historical premium. During its third-quarter conference call, M&I noted credit deterioration in several areas of its portfolio related to residential real estate, Usdin said. "As a standalone bank, M&I should deliver financial results that stack among the better performers in

the industry. Issues with credit quality are likely to prevent meaningful upside near-term, until concerns over the company's residential builder portfolio dissipate," the analyst wrote. "The outsized amount of excess capital and higher ... dividend yield offer support."

48. On December 17, 2007, the Company announced fourth quarter events through a press release, and disclosed, among other things,

> M&I continues to assess its loan portfolio, particularly as the real estate segment continues to deteriorate. M&I expects that charge-offs in the fourth quarter may be up to $195 million and the loan loss provision in the fourth quarter may be up to $235 million. At November 30, 2007, M&I had a consolidated tangible capital ratio of approximately 9.6 percent.

The estimated $195 million write-off for the fourth quarter was a staggering thirteen times the prior year's fourth quarter write-offs of $15 million.

49. On January 15, 2008, M&I announced that profit more than doubled in the fourth quarter because of gains from spinning off Metavante, a major segment, but warned that the bank's remaining business suffered from decaying credit quality. Excluding the gain from the Metavante spin-off and a few other extraordinary items, M&I lost $24.5 million, or 9 cents per share, compared with income from continuing operations of $161.4 million, or 62 cents per share, in the fourth quarter of 2006. Analysts polled by Thomson Financial forecast profit of 19 cents per share. The losses stemmed from the reserve on December 17, 2007, referenced above, which wound up being $235.1 million. In addition, M&I wrote off $191.6 million in loans, or 1.67 percent of its portfolio.

50. This staggeringly large provision for credit losses in the fourth quarter of 2007 exceeded the provision established for the previous 15 quarters combined. M&I shares fell $1.06, or 4.3 percent, to $23.83 in morning trading following the announcement.

51.     As a result of the Company's credit problems, on January 16, 2008, M&I stock was downgraded to "Sell" from "Neutral" at Merrill Lynch.

52.     On April 15, 2008, M&I announced that its first quarter 2008 profits fell 33 percent, reflecting the spinoff of Metavante and credit losses for real estate developers. The Company's net income declined to $146.2 million, or 56 cents per share, from $216.8 million, or 83 cents per share, a year earlier. Profit from continuing operations fell 13 percent to $146.2 million from $168.8 million, and the Company set aside $146.3 million for loan and lease losses, up more than eightfold from $17.1 million a year earlier, as the value of loan collateral fell and customers, particularly mid-sized local developers, had trouble making payments. Net charge-offs rose about ninefold to $131.1 million from $14.7 million.

53.     On June 11, 2008, Company shares slid 7.4 percent, their biggest percentage fall since August of 1998. M&I stock was added to the "conviction sell list" at Goldman Sachs. M&I is "among the most exposed" to impairment of construction loans, which is likely to be "the dominant issue for mid-cap banks" in the second quarter, analysts wrote in a report.

54.     On July 3, 2008, M&I issued a surprise warning that it would have to set aside more money to cover loan losses for housing loans. As a result, M&I shares fell 3.8% to $13.61 during after-hours trading on July 3, 2008.

55.     A MarketWatch article entitled, "Marshall & Ilsley warns of big loss from housing market woes" reported that "[s]till, M&I stressed that it isn't planning to raise capital. The company's board is confident in the current dividend, it added." Company CEO Furlong stated "We are disappointed with a loss in the second quarter; however, we are fortunate that our strong capital position allows us to increase our reserves without cutting our dividend or engaging in a dilutive capital raising transaction." But the Company's "strong capital position",

was illusory. The Company would, in fact, need to slash dividends and raise capital on multiple occasions because of its loan problems.

56. Another *MarketWatch* article of the same day entitled "Stocks in Focus for Monday" noted that:

> After Thursday's closing bell, Marshall & Ilsley Corp. (MI) said it expects to take a higher-than-expected provision for loan and lease losses in the second quarter and cut its outlook because of the poor housing market. The financial services firm said it expects to take a provision of at least $900 million in the second quarter, up from a previously expected second-quarter charge of $415 million. Marshall & Ilsley said it expects a second-quarter loss of $1.50 to $1.60 a share, but expects a profit in the third quarter. Analysts surveyed by FactSet Research estimated a second-quarter profit of 37 cents a share.

57. Also on July 3, 2008, Fitch downgraded M&I's debt, and put the Company on rating watch negative, noting that:

> Fitch Ratings has downgraded the Individual rating and short-term Issuer Default Rating (IDR) of Marshall & Ilsley Corporation (MI) and its subsidiary banks including M&I Marshall & Ilsley Bank to 'B' and 'F1', respectively. Fitch has also placed the company's 'A+' long-term IDR and other long-term ratings on Rating Watch Negative. A complete list follows below.
>
> MI recently announced its expectation of taking a sizeable $900 million provision to build its loan loss reserve in the second quarter of 2008. This will result in a net loss for the quarter of around $400 million. The provision will build the reserve to approximately 2.0% of loans. MI is seeing increasing loss rates as it attempts to move aggressively to dispose of problematic or potentially problematic loans, especially in the West Coast of Florida and Arizona construction and land development loan portfolio. These portfolios totaled approximately $4.3 billion at March 31, 2008. Despite the loss for the quarter, capital levels remain solid with a Tier 1 capital ratio of approximately 8.0% and a tangible capital ratio of 7.1%.
>
> While MI's problematic areas of its loan portfolio appear to be well contained, construction and land development are sizeable exposures for the company. The negative watch reflects the continued uncertainty in this portfolio as well as increased

20

potential for problems in other portfolios as the economy worsens. If problems intensify or if the company does not return to profitability in the near term, further rating actions could occur.

58. The market also became increasingly concerned about M&I in particular as problems in the housing market spread to commercial real estate. Experts predicted disproportionate problems for M&I, which had greater exposure to commercial construction loans than its peers. Such concerns should have been considered by the Plans' fiduciaries in their continued offering of the Fund.

59. JPMorgan responded to the news by dropping M&I's stock to "Underweight" from "Neutral" and noting that its credit pressure is much worse than they expected. JPMorgan stated that the company's excess capital in comparison with its peers is quickly diminishing, in light of its large Q2 loss and the over $500M in cash it used to fund an acquisition, and recommended that investors sell M&I's stock, until the bank's "credit picture shows at a minimum signs of stability." Similarly, Morgan Keegan downgraded the stock to "market perform" from "outperform" and said there was a possibility of a dividend cut by the bank. Also, Ladenburg Thalmann's analyst Richard Bove said he expects the Company to post a loss of 6 cents a share for 2008, down from his prior estimate of profit of $1.77 a share.

60. On July 16, 2008, M&I reported a 2008 second quarter net loss of $393.8 million, or $1.52 per share, as compared to income from continuing operations of $178.9 million, or $0.68 per share, in the second quarter of 2007. During a conference call on the same day with analysts, Company CFO Greg Smith stated "We feel very confident that we'll return to profitability in the third quarter and the fourth quarter," because the Company had already taken aggressive steps to account for its bad debt and realized partial charge-offs of $386 million against its non-performing loans, he said.

61.     In reality, the Company had not done nearly enough to account for its bad debt and the Company's chances of near-term profitability were practically non-existent.

62.     On September 10, 2008, as a result of the Company's credit woes, Keefe Bruyette downgraded M&I stock to "underperform" from "market perform."

63.     On October 15, 2008, the Company announced its earnings for the third quarter of 2008, noting that its third-quarter profit fell 62 percent, hurt by increased credit costs, though results improved from the second quarter. M&I announced that it had set aside $155 million for losses on loans and leases, up from $41.5 million a year earlier, while net charge-offs rose more than fivefold to $152.3 million and said that construction and development portfolio experienced more deterioration in the ability of small and mid-sized local developers to repay their loans, especially as property values fell.

64.     In response to this announcement, Company stock fell 7.7%.

65.     Again, in response to the Company's loan exposure, on December 5, 2008, Fox-Pitt Kelton downgraded M&I because of concerns that outsized exposure to residential construction and home equity will continue to pressure its earnings and capital, according to a Fox-Pitt Kelton analyst, who downgraded the stock and said a dividend cut by the bank was imminent. "Residential construction is still the largest area of concern and will remain an overhang for some time," Fox-Pitt analyst Andrew Marquardt said in a note to clients. He estimated that over half of M&I's $6.4 billion residential construction exposure lies within the stressed markets of Florida and Arizona. Marquardt, who downgraded the stock to "underperform" from "in line," said he did not believe the bank could earn its dividend going forward and lowered his price target on the stock to $10 from $16 and widened his 2008 loss estimate for the bank to $1.70 a share from a loss of 58 cents a share, noting that for 2009, he

expected the company to post a loss of 45 cents a share, down from his prior view of a profit of $1.05 a share.

66.     The Company's troubles continued to become clearer. At the end of 2008, M&I was identified as one of the many financial services companies receiving large amounts of taxpayer-funded capital through the U.S. Treasury that may be in worse shape than previously disclosed, according to a research report by Audit Integrity, a Los Angeles-based firm that rates companies based on corporate integrity risk. The report looked at the 25 financial services companies that have received more than 90 percent of funding doled out so far through the federal government's Troubled Asset Relief Program, or TARP. The report found that more than 80 percent of those companies have a "very aggressive" or "aggressive" accounting and governance risk rating based on recent regulatory filings, and have a high likelihood to restate earnings or be affected by other adverse events such as regulatory actions or shareholder litigation, compared to a 35 percent "very aggressive" or "aggressive" rating among the 7,000 public companies measured overall by Audit Integrity. Fourteen of the twenty-five financial services companies studied were rated as "very aggressive," including M&I, which received $1.7 billion from the Treasury program. The report stated:

> "As a group *these are very risky companies*. The use of federal money to bail them out should be pause for concern on several levels," said Jack Zwingli, Audit Integrity chief executive. "Unfortunately, *the odds are that a number of these companies will fail at some level in the future*, which raises the concern that the government is throwing good money after bad. At a minimum we should demand a thorough review of their accounting and corporate governance practices." (emphasis added).

67.     On January 15, 2009, M&I reported large losses of $403.9 million, or $1.55 per share, for the fourth quarter of 2008 and a grim outlook for 2009. The Company also announced that it was cutting its workforce by 8 percent company wide and slashing its dividend to 1 cent

per share from 32 cents per share (ending 36 consecutive years of dividend increases). Deterioration in the Company's construction and development loan portfolio was a primary source of problems for M&I. As of December 31, 2008, the Company had $1 billion in construction and development loans in nonperforming status, which are loans on a bank's books that aren't generating income. The Company also said that its loan-loss ratio jumped by a whopping 522 basis points, to 5.38%. Construction and land development loans were a main factor for the deterioration, the bank said - such loans made up 68% of loan losses in the fourth quarter.

68.     On the news of the Company's problems, M&I shares closed down $2.79, or 26%, at $7.93 on January 15, 2009.

69.     Additionally, as a result of the news, analyst Ken Zerbe of Morgan Stanley wrote that M&I's "formerly strong capital position has now fallen noticeably below its peers. We still see further credit deterioration as a headwind for the stock." DBRS also downgraded to "A (low)" from "A" all long-term ratings of U.S. bank Marshall & Ilsley Corporation and its subsidiaries, including Marshall & Ilsley's issuer and senior debt, and also downgraded to "R-1 (low)" from "R-1 (middle)" the short-term ratings of the company's banking subsidiaries, and confirmed at "R-1 (low)" the short-term rating of Marshall & Ilsley, noting that the outlook on all ratings remains "negative" except for the short-term ratings of the bank subsidiaries, which are "stable." Analyst Richard X. Bove of Ladenburg Thalmann & Co. wrote in a research report, "The [C]ompany is facing a bleak 2009 and possibly 2010. It had hoped to experience some positive resolution to its problems in real estate lending outside of its home state of Wisconsin but this is not happening. Rather the problems are intensifying." Similarly, S&P lowered M&I's

long-term counterparty credit rating on M&I and M&I LLC, the second-tier holding company, to

'BBB+' from 'A-' and noted that the outlook is negative. S&P further stated that:

> "The downgrade was triggered by the company's announcement of *another massive loan-loss provision and outsize net loss for fourth-quarter 2008, as asset quality continues to deteriorate*," said Standard & Poor's credit analyst Charles D. Rauch. Loan deterioration remains centered on Marshall & Ilsley's relatively sizable exposure to residential construction and land development loans, particularly in Arizona, one of the most overbuilt real estate markets in the country. In fourth-quarter 2008, Marshall & Ilsley recorded an *$850 million provision for loan losses* to cover $680 million of net charge-offs (NCOs) and to boost the loan-loss reserve to 2.4% of total loans at the end of 2008. *Even after the sizable NCOs for the quarter, nonperforming assets continue to climb, reaching approximately 4.2% of total loans at year end.* Because the country is in the midst of a national recession, we believe Marshall & Ilsley will confront more widespread asset-quality difficulties in 2009. The massive loan-loss provision has led to a $404 million net loss for the fourth quarter and a $568 million net loss for full-year 2008. Tangible capital ratios, which now include $1.7 billion of the U.S. Treasury's Troubled Asset Relief Program preferred stock, have declined modestly during the past year. Consequently, the company is taking steps to conserve capital. It has cut its quarterly common stock dividend to $0.01 per share and has undertaken an expense reduction program throughout the organization. Current ratings consider Marshall & Ilsley's solid competitive position within the Wisconsin banking market and its focus on operating efficiencies, which will be needed to support earnings as the bank continues to address its asset-quality problems. The negative outlook reflects our concern that Marshall & Isley's ongoing asset-quality problems will necessitate high provisions for loan losses and depress profitability in 2009. If the company needs to take more outsize provisions, resulting in another quarterly loss, we could lower the ratings again. Alternatively, if Marshall & Ilsley can quickly resolve its asset-quality problems and return to historical levels of profitability, we could revise the outlook to stable. We do not see any upside potential to the ratings.

70.     The downgrades continued.  On February 3, 2009, M&I stock fell an additional

17% after Goldman Sachs cut its price target on the Company to $5 from $11.  On February 23,

2009, Moody's and Citigroup also downgraded the Company.  The downgrade by Moody's

reflects the ratings agency's view that M&I's credit profile has been materially weakened by its large commitment to construction and development financing, which Moody's indicated it believed would continue to deteriorate in 2009.

71.    On March 2, 2009, M&I reported a revised 2008 fourth quarter net loss driven by a noncash goodwill impairment charge resulting from stock price decline. The Company revised its fourth-quarter net loss to $1.9 billion from $404 million after reporting a goodwill impairment charge of $1.5 billion triggered by the regional bank's tumbling share price. "In an environment like we have now, with the decline in the economy that is as persistent and deep as it is, one would expect that impairment testing probably needs to be more frequent," said Gary B. Townsend, the chief executive of Hill-Townsend Capital LLC. Greg Smith, M&I's senior vice president and chief financial officer, said it typically tests for goodwill annually, though market volatility and the declining economic environment are prompting it to run quarterly impairment tests.

72.    M&I's shares sank 32% in last three months of 2008 and had dropped 68% in the first three months of 2009. On March 2, 2009, M&I stock closed at $4.43.

73.    As a result of the announcement, on March 3, 2009, Fox-Pitt Kelton said capital levels at M&I Corp will continue to erode due to higher credit costs and the company may need more capital at some point. The brokerage, which maintained its "underperform" rating on the stock, said the non-cash goodwill charge had no impact on capital since goodwill is excluded from regulatory capital and tangible common equity calculations.

74.    On February 23, 2009, Moody's, again, downgraded M&I's debt to C+ from B for bank financial strength and to A2 from AA3 for long-term deposits. "The downgrade reflects Moody's view that M&I's credit profile has been materially weakened by its large commitment

to construction and development financing, a portfolio that grew significantly earlier this decade," Moody's said in a statement. The ratings agency said the Company's near-term earnings potential and capital position will deteriorate, but that its receipt of $1.7 billion in federal money and the near elimination of its common dividend will help M&I absorb significant losses.

75.    On April 23, 2009, M&I announced that it had a first-quarter loss of $116.9 million, or 44 cents a share, on an increase in loan-loss provisions, down from net income of $146.2 million, or 56 cents per share, a year ago. The Company, which had reported losses in three of the last four quarters, continues to face problems in estimated values and repayment abilities among residential real estate developers, especially in Arizona and Florida. Net charge-offs, which are loans that have been written off, were $328 million, three times the $131.1 million in net charge-offs for the first quarter of 2008. Nonperforming loans of $2.5 billion were up from $787 million a year ago. "Although these are disappointing results, our excess capital, strong liquidity position and high levels of reserves will keep us ahead of the industry's challenges," said president and chief executive Mark Furlong.

76.    On April 23, 2009, Company stock tumbled more than 6% and the bank was cut to "market perform" from "outperform" by Morgan Stanley.

77.    Also, on April 27, 2009, Fitch downgraded M&I's IDR to 'BBB+'; Outlook Negative, noting that:

> MI reported its third net loss in four quarters, largely reflecting elevated loan loss provisions as the company *continues to build reserve levels amidst deteriorating credit quality*. MI continues to struggle with high levels of problem assets stemming from its construction and development (C&LD) portfolio, especially in its Arizona, West Coast of Florida and correspondent books.
>
> *Although MI has attempted to reduce this exposure through approximately $1 billion in loan sales over the last year,*

> *nonperforming assets (NPAs) remain high at nearly 6%, as of March 31, 2009. MI has not been overly successful in controlling growth in its level of NPAs, which have grown approximately 200% since a year ago.* An outsized exposure to C&LD lending, combined with a deteriorating economy and continually declining land values, have created headwinds in the company's ability to expeditiously work through problematic loans. Supporting the rating action, *Fitch expects that MI's C&LD book will lead to continued levels of elevated credit costs over the near-term, which could impede a return to profitability.*
>
> MI had the benefit of entering this economic cycle with solid levels of TCE. *However, while still sound, MI's level of tangible common equity at 6.4% has become less of a point of differentiation especially given the company's high level of NPAs.*
>
> The Negative Outlook reflects the continued uncertainty in this portfolio as well as increased potential for problems in other portfolios as the economy worsens. If problems intensify, further rating actions could occur.

78.    M&I's shares fell 7.4% on the news.

79.    On April 29, 2009, at the Company's annual meeting, M&I executives acknowledged, as they had in the past, that they lent to real estate development customers too long into the housing cycle, especially in Arizona. As a result, as housing prices have dropped in that market, the bank has taken big losses. "In no way is this management team telling you we didn't make any errors," Defendant Kuester said.

80.    On July 17, 2009, the Company announced that its second-quarter loss had narrowed on sharply lower loss provisions, but that loan quality continued to worsen during the quarter. M&I lost $139.3 million in the second quarter of 2009 as loans related to construction and development continued to deteriorate, its third consecutive quarterly loss. "It appears that nonperforming loans and generally nonperforming assets have increased substantially sequentially, which undoubtedly will create a continued drag on earnings as a result of elevated provision expenses," Raymond James analyst Dennis Klaeser told Dow Jones Newswires.

M&I's non-performing loans and charge-offs both rose sequentially and from a year earlier, raising concerns about credit trends, in particular in the company's commercial real-estate portfolio. Analysts also noted that M&I's commercial real-estate portfolio is starting to hurt its results.

81. News of the Company's further troubles dragged down shares 12% to close at $4.63 on July 17, 2009. As of July 2009, the shares had lost nearly 70% of their value over the prior 12 months.

82. On July 22, 2009, DBRS placed M&I under review with negative implications, noting that income has come under pressure, reducing M&I's ability to earn its way out of its asset quality issues. According to DBRS, "given the asset deterioriation in asset quality at M&I, DBRS does not expect the Company to return to profitability over the immediate term."

83. On August 14, 2009, Bloomberg News issued a report entitled "Toxic Loans Topping 5% May Push 150 Banks to Point of No Return." The report noted that "[t]he biggest banks with nonperforming loans of at least 5 percent include Wisconsin's Marshall & Ilsley Corp. and Georgia's Synovus Financial Corp., according to Bloomberg data." The Bloomberg report noted that "[m]ore than 150 publicly traded U.S. lenders own nonperforming loans that equal 5 percent or more of their holdings, a level that former regulators say can wipe out a bank's equity and *threaten its survival.*" (emphasis added).

> "At a 3 percent level, I'd be concerned that there's some underlying issue, and if they're at 5 percent, chances are regulators have them classified as being in unsafe and unsound condition," said Walter Mix, former commissioner of the California Department of Financial Institutions, and now a managing director of consulting firm LECG in Los Angeles. He wasn't commenting on any specific banks.

* * *

Marshall & Ilsley, Wisconsin's biggest bank, reduced its nonperforming loans last month to 5.01 percent from 5.18 percent after selling $297 million in soured loans, mostly residential mortgages in Arizona, the Milwaukee-based company said Aug. 10.

Deadline for Nonperformers

The bank has "been very aggressive in identifying and tackling credit challenges," Chief Financial Officer Greg Smith said in an Aug. 12 interview. Smith said 26 percent of loans classified as nonperforming are overdue by less than the industry's typical standard of 90 days. With those excluded, the ratio would be around 3.7 percent, he said.

84.  """"On September 1, 2009, Fitch placed M&I's Issuer Default Rating (IRD) and Debt Ratings on "Watch Negative" noting that M&I's nonperforming assets ratio exceeds levels seen at its peers in recent quarters.

85.  On September 14, 2009, an article in the *Pittsburgh Tribune Review* entitled "Which to buy, which to shy from" noted of M&I:

The biggest loser in the S&P 500 this year is Marshall & Ilsley Corp., the largest banking company in Wisconsin. Amid rising real-estate lending losses, its shares have fallen 50 percent this year, to $6.86.

The company lost $2 billion in 2008, and took $1.7 billion in money from the government's Troubled Assets Relief Program. It has $3.6 billion in nonperforming assets, consisting of $2.4 billion in non-accrual loans, $818 million in restructured loans, and $357 million in so-called other real estate owned, which is basically repossessed buildings.

My take? Stay away if you want safety. But if you allocate a small portion of your portfolio to speculation, Marshall & Ilsley makes an intriguing flyer. The stock sells for only 0.5 times revenue and 0.5 times book value.

86.  On October 6, 2009, in a press release entitled "Marshall & Ilsley Corporation Announces Events Impacting Third Quarter," the Company guided for a Q3 loss and raised its loan-loss provision over concern about raising capital.  M&I announced it is looking for a Q3

loss of 68 cents to 70 cents per share. Analysts' consensus view calls for a 39-cents-per-share loss, according to a Thomson Reuters poll. The Company said the allowance for loan and lease losses as a percentage of total loans and leases will top 3% from 2.8% previously. The press release included the following:

Improving trends in credit quality:

Nonperforming loans expected to decrease by approximately $170 million from June 30, 2009 to slightly less than 4.9 percent of total loans at September 30, 2009 - first decline in four years.

Early stage delinquencies expected to decline $220 million, or 20 percent, from June 30, 2009 - at lowest level since March 31, 2008.

Allowance for loan and lease losses expected to increase to slightly over 3 percent of total loans at September 30, 2009.

2009 third quarter provision of approximately $390 to $400 million consistent with prior expectations (before special provision for certain bank holding company loans).

M&I takes aggressive action on bank holding company loan portfolio:

2009 third quarter special provision of approximately $185 million for bank holding company loans.

2009 third quarter provision for loan and lease losses expected to be in the range of $575 to $585 million and total net charge-offs expected to be in the range of $530 million to $540 million.

Loss per share for the 2009 third quarter expected to be in the range of $0.68 to $0.70.

87.     As a result, M&I shares fell 24 cents, or 3%, to close at $7.70.

88.     On October 20, 2009, the Company announced a public offering of $775 million of its common stock for sale (its second stock offering of the year, on top of a TARP payment

from the government) and separately reported a 2009 third quarter net loss of $248.4 million, or $0.68 per share, as compared to net income of $83.1 million, or $0.32 per share, in the third quarter of 2008. The loss was its fourth straight quarterly loss on bad loans. "Our financial results during the third quarter of 2009 were negatively impacted by bank holding company loans and housing-related credits," said Mark Furlong, president and CEO of M&I. ""

89.     In response to this news, analyst Preeti S. Dixit of J.P.Morgan issued an alert stating, "it appears to us that any way you slice it, there is continued significant loss content in the loan book."

90.     Shares of M&I fell by 82 cents, or 11.4%, to $6.36, and rallied slightly to close at $6.55, down 9.6%, on October 20, 2009. Earlier in the session, the stock touched an intraday low of $6.29. More than 5.9 million shares changed hands by 11 a.m. EDT Friday, October 23, compared to the stock's three-month average daily volume of 8.3 million, according to the Nasdaq.

91.     On November 3, 2009, DBRS downgraded M&I's Issuer and Senior Debt rating to BBB from A citing the Company's shrinking loan portfolio, deteriorating core income and credit problems.

92.     On December 4, 2009, Moody's Investors Service again downgraded the ratings of M&I and its subsidiaries and also changed its outlook to negative. Moody's downgraded the Company's senior debt by one notch to Baa1, characterized as lower medium grade investment debt, from A3, which is upper medium grade investment. Moody's said its downgrade reflects the likelihood that the Company "faces sizable credit losses throughout 2010 resulting from its real estate concentration." 'See "Moody's downgrades Marshall & Ilsley ratings," Associated Press, December 4, 2009.

93. As a result of the Company's poor loan quality, extensive write-downs and reserves, and continuous downgrades during the Class Period, the Company's stock, which had been trading at $46.92 per share on November 10, 2006, swiftly and steadily declined to a closing price of $5.31 per share on December 17, 2009, a decrease of $41.61 per share, or almost 89%. Meanwhile, the Plans' fiduciaries, despite having fiduciary duties and unfettered discretion to protect the retirement savings of the proposed Class, did not act consistently with their duties under ERISA.

## BREACHES OF FIDUCIARY DUTY

94. As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by M&I with the SEC under the federal securities laws. These filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading. The fiduciary communications sent to Plan participants did not adequately explain the risk and return profile of the Fund, including that (a) the Company had strayed far from its core competencies into riskier regions, and that the Company made risky loans in an attempt to foist profits; (b) the Company was experiencing significant net loss and credit-quality deteriorations; (c) there were serious concerns about the Company's capital levels and seemingly ever-increasing reserves during the Class Period; (d) the Company lacked a reasonable basis for its positive statements about its lending, business, operations and earnings prospects; (e) the Company's long-developed reputation for making solid loans suffered significantly as a result of the Company's imprudent lending practices; and (f) the Company's debt and equity were repeatedly downgraded during the Class Period as a result of the Company's poor loan quality. The above-described serious problems faced by the

Company which led to, *inter alia*, the artificial inflation of M&I common stock and created dire financial circumstances for the Company such that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plans, and consequently, to its Participants.

95. Defendants were not obligated by ERISA or by the Plans to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate. Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plans and the Participants as set forth above.

96. At all relevant times, Defendants should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs. For example, the Plan's SPD, *available at* https://www.hr.micorp.com/mi2/mi_benefits/mi_retirement/summary.html, last downloaded March 23, 2010) states that:

> The Securities and Exchange Commission (SEC) allows us to "incorporate by reference" the information we file with them, which means:
>
> The Securities and Exchange Commission (SEC) allows us to "incorporate by reference" the information we file with them, which means:
>
> ☐ incorporated documents are considered part of the prospectus,
>
> ☐ we can disclose important information to you by referring you to those documents, and

□ information we file with the SEC will automatically update and supersede this prospectus.

We incorporate by reference the following filings we made with the SEC:

□ Our Annual Report on Form 10-K, and

□ The description of our common stock contained in the Corporation's registration statement filed pursuant to Section 12(b) of the Securities Exchange Act of 1934, as amended.

We also incorporate by reference each of the following future filings that we will make with the SEC until we file a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold.

□ Any amendment or report filed for the purpose of updating the description of our common stock,

□ Reports filed under Sections 13(a), 13(c) and 15(d) of the Exchange Act, and

□ Definitive proxy or information statements filed under Section 14 of the Exchange Act in connection with any subsequent shareholders' meeting.

You may obtain a copy of any of these documents without charge by writing to the Office of the Corporate Secretary of the Corporation c/o Investor Relations at 770 North Water Street, Milwaukee, Wisconsin 53202, by calling M&I's Shareholder Information Line at (800) 318-0208, or by selecting the Investor Information button on M&I's website at www.micorp.com.

This summary plan description constitutes a prospectus covering securities that have been registered under the Securities Act of 1933. The date of this prospectus is January 1, 2007.

97.   M&I opened the class period trading at $46.92 per share on November 10, 2006, swiftly and steadily declined to a closing price of $5.31 per share on December 17, 2009, a decrease of $41.61 per share, or almost 89%, thereby greatly diminishing the retirement benefits of Plaintiff and the Plans' participants.

## MISMANAGEMENT OF PLAN ASSETS

98.     Pursuant to ERISA Section 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plans with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. The Company Stock Fund was an imprudent investment for the Plans because: (a) the Company had strayed far from its core competencies into riskier regions, and there the Company made risky loans in an attempt to foist profits; (b) the Company was experiencing significant net loss and credit-quality deteriorations; (c) there were serious concerns about the Company's capital levels and seemingly ever-increasing reserves during the Class Period; (d) the Company lacked a reasonable basis for its positive statements about its lending, business, operations and earnings prospects; (e) the Company's long-developed reputation for making solid loans suffered significantly as a result of the Company's imprudent lending practices; (f) the Company's debt and equity were repeatedly downgraded during the Class Period as a result of the Company's poor loan quality; (g) the above-described serious problems faced by the Company led to, *inter alia*, the artificial inflation of M&I common stock and created dire financial circumstances for the Company; and (h) heavy investment of retirement savings in Company Stock would inevitably result in significant losses to the Plans, and consequently, to its Participants.

99.     Defendants are not entitled to the protections of ERISA Section 404(c), 29 U.S.C. § 1104(c), because the Participants did not exercise independent control over their accounts, because Defendants subjected them to improper influence with respect to the Plans' investments

in M&I common stock, and because Defendants concealed material non-public information concerning M&I that they were not precluded from disclosing under applicable law.

100. Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that the Plans should not have invested in M&I common stock during the Class Period.

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

101. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

102. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

103. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that investment options made available under a Plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company's stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

104. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C.

§ 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

105.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

106.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that, as described herein, M&I common stock was not a suitable and appropriate investment for the Plans. Investment in Company stock during the Class Period clearly did not serve the Plans' stated purpose, and was clearly too risky for retirement savings. Consequently, the Fund should not have been offered as a Plan investment option, Plan assets should not have been invested in the Fund and Fund assets should not have been invested in Company common stock. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plans and their Participants from the inevitable losses that they knew or should have known would ensue as a result of the above-described problems.

107.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, Participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

108.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

109.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their retirement investment.

110.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by M&I and Kuester)**

111.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112.    At all relevant times, as alleged above, M&I and Kuester were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

113.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of M&I and Kuester included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the appointed Investment Committee and all other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

114.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, M&I and Kuester, had the duty to:

> (1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' Participants;

> (2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

> (3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

> (4)    Ensure that the monitored fiduciaries have ready access to outside,

40

impartial advisors when needed;

(5)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investments; and

(6)     Ensure that the monitored fiduciaries report regularly to M&I and Kuester. The Company and/or Kuester must then review, understand, and approve the conduct of the hands-on fiduciaries.

115.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

116.    M&I and Kuester breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  M&I and Kuester knew or should have known that the fiduciaries they were responsible for monitoring were: (i) continuing to invest the assets of the Plans in Company stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plans to continue

offering Company stock as an investment alternative. Despite this knowledge, M&I and Kuester failed to take action to protect the Plans, and concomitantly the Plans' Participants, from the consequences of these fiduciaries' failures.

117.    In addition, M&I and Kuester, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of M&I that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

118.    M&I and Kuester are each liable as co-fiduciaries because they knowingly participated in the other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

119.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their retirement investments.

120.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

121.    The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company

Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plans' Participants.

122. Defendants are responsible for losses caused by Participants' failure to exercise voluntary diversification options. By failing to apprise Participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described herein, Defendants misrepresented the soundness of Company stock as an investment vehicle. As a consequence, regardless of any ability to divest, Participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

123. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

124. As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

125. ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

126. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or

43

maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

127. Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) other appropriate relief to remedy the breaches alleged above; (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or relief as may be just and proper.

128. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A. Actual damages in the amount of any losses the Plans suffered, with such losses to be allocated among the Participants' individual Plan accounts in proportion to the accounts' losses;

B. Costs pursuant to 29 U.S.C. § 1132(g);

C. Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and,

D. Such other relief as the Court may deem just.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues so triable.

Dated: April 12, 2010

STULL, STULL & BRODY

By: _____
Edwin J. Mills
Michael J. Klein
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

Major Khan
**MAJOR KHAN, LLC**
20 Bellevue Street
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

*Counsel for Plaintiff*

Robert D. Allison
Bruce Howard
**ROBERT D. ALLISON ASSOCIATES**
122 S. Michigan Ave., Ste. 1850
Chicago, Illinois 60603
Telephone: (312) 427-7600
Facsimile: (312) 427-1850

*Designated Local Counsel*