# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

—————————————————————————————

LINDA F. WHITE and CHARLENE L. ROUNDTREE, ) 
on Behalf of Themselves, the M&I Retirement Program, ) 
the North Star Financial 401(k) Plan, the Missouri State ) 
Bank and Trust Retirement Savings Plan, the NYCE ) 
Corporation Employees Tax Deferred Savings Plan and a ) 
Class of Persons Similarly Situated, ) 
          ) 
            Plaintiffs, )     Case No. 10-cv-00311 
          ) 
          v. )     Honorable J.P. Stadtmueller 
          ) 
MARSHALL & ILSLEY CORPORATION; M&I ) 
RETIREMENT INVESTMENT COMMITTEE; JON ) 
CHAIT, TED KELLNER, DREW BAUR, KATHARINE ) 
LYALL, JOHN MELLOWES, RETIREMENT ) 
COMMITTEE OF THE M&I RETIREMENT ) 
PROGRAM, PAUL J. RENARD; DENNIS R. ) 
SALENTINE; JOHN DOES 1-10, AND; DENNIS J. ) 
KUESTER, ) 
          ) 
            Defendants. ) 
—————————————————————————————— ) 
          ) 
THIS DOCUMENT RELATES TO: ) 
      All Actions ) 
—————————————————————————————— ) 

## DEFENDANTS' BRIEF IN SUPPORT
## OF ITS MOTION TO DISMISS

**Table of Contents**

Page

**TABLE OF AUTHORITIES** ................................................................................iii

**INTRODUCTION**..............................................................................................1

**STATEMENT OF FACTS**................................................................................4

I.      The M&I Plan .............................................................................................4

II.     The Parties. ................................................................................................6

III.    Summary of Claims and Allegations ..........................................................6

**ARGUMENT**....................................................................................................8

I.      AS A MATTER OF LAW, COUNT I FAILS TO STATE A CLAIM FOR
        BREACH OF ANY DISCLOSURE DUTIES...............................................9

        A.      Plaintiffs Fail to Plead Actionable Misrepresentations About M&I's Actual
                Performance. .............................................................................10

        B.      Plaintiffs Fail to Allege Any Facts Showing That M&I's Projections Contained
                Misrepresentations. ...................................................................12

        C.      Plaintiffs' Omission Claims Fail Both Because Defendants
                Were Not Required to Disclose the Allegedly Omitted Information
                and Because the Information Was Disclosed...........................15

                1.      ERISA does not require disclosure of the type of information
                        plaintiffs have identified. ...............................................15

                2.      Plaintiffs' omission claims fail because the allegedly omitted
                        information was disclosed...............................................17

        D.      Plaintiffs Fail to Allege Facts Indicating That Defendants Intentionally
                Made Any Misrepresentations or Omissions............................22

II.     COUNT I FAILS TO STATE A CLAIM THAT DEFENDANTS OTHERWISE
        BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE. ......................23

        A.      Plan Fiduciaries Are Generally Required to Follow the Plan Documents............23

        B.      Where, as Here ERISA Plan Requires Investment Company Stock, There Is a
                Substantive Presumption That Continued Investment Is Prudent........................24

i

C.     The Presumption of Prudence Can Only Be Overcome in Exceptional Circumstances. ........................................................................................26

D.     As a Matter of Law, Plaintiffs Fail to Overcome the Presumption of Prudence. ...27

E.     The Actions of Other Plan Fiduciaries Further Demonstrate That Plaintiffs' Theory of Imprudence Is Implausible. .................................................30

III.    PLAINTIFFS' RELATED CLAIMS FAIL AS A MATTER OF A LAW. ......................31

IV.    PLAINTIFFS LACK STANDING TO ALLEGE CLAIMS ARISING FROM PLANS IN WHICH THEY WERE NOT PARTICIPANTS .................................................33

**CONCLUSION** ........................................................................................................33

Case 2:10-cv-00311-JPS   Filed 10/22/10   Page 3 of 42   Document 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. Pac. Enters.*,
    950 F.2d 611 (9th Cir. 1991) ..............................................................................33

*Arazie v. Mullane*,
    2 F.3d 1456 (7th Cir. 1993) ...............................................................................12

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).............................................................................4, 9, 32

*In re Avon Prods., Inc. Sec. Litig.*,
    2009 WL 848083 (S.D.N.Y. Mar. 3, 2009) ..........................................................3

*In re Bausch & Lomb Inc. ERISA Litig.*,
    2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008)...................................................14

*Beach v. Commonwealth Edison Co.*,
    382 F.3d 656 (7th Cir. 2004) .............................................................................12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................4, 9, 32

*Brieger v. Tellabs, Inc.*,
    629 F. Supp. 2d 848 (N.D. Ill. 2009) .......................................................16, 28, 29

*Ciresi v. Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991).....................................................................14

*In re Citigroup ERISA Litig*,
    2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009)................................11, 16, 17, 30

*In re Constellation Energy Group*,
    2010 WL 3221821 (D. Md. Aug. 13, 2010) .........................................22, 30, 32

*Crowley v. Corning, Inc.*,
    234 F. Supp. 2d 222 (W.D.N.Y. 2002) ...............................................................14

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) .....................................................................12, 14, 23

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) ..................................................................................13

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..................................................................................12

*Edgar v. Avaya, Inc.*,
   2006 WL 1084087 (D.N.J. Apr. 25, 2006),
   *aff'd* 503 F.3d 340 (3d Cir. 2007) .............................................12, 17, 24, 25, 28

*Evans v. Akers*,
   534 F.3d 65 (1st Cir. 2008)...................................................................................25

*Fisher v. JP Morgan Chase & Co.*,
   703 F. Supp. 2d 374 (S.D.N.Y. 2010)...............................................................11, 12

*Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ................................................................................17

*In re Gen. Growth Props., Inc.*,
   2010 WL 1840245 (N.D. Ill. May 6, 2010).....................................10, 11, 15, 16, 22

*George v. Kraft Foods Global, Inc.*,
   684 F. Supp. 2d 992 (N.D. Ill. 2010) .....................................................................16

*Graden v. Conexant Sys., Inc.*,
   574 F. Supp. 2d 456 (D.N.J. 2008) ........................................................................15

*In re Harley-Davidson, Inc., Sec. Litig.*,
   660 F. Supp. 2d 953 (E.D. Wis. 2009)............................................................9, 15, 31

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .....................................................................5, 9, 22, 29

*In re Huntington Bancshares Inc. ERISA Litig.*,
   620 F. Supp. 2d 842 (S.D. Ohio 2009) ................................5, 7, 10, 14, 21, 28, 31

*In re I.B.M. Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)..................................................................................13

*Johnson v. Radian Group, Inc.*,
   2010 WL 2136562 (E.D. Pa. May 26, 2010) ..........................................................14

*Kenseth v. Dean Health Plan, Inc.*,
   610 F.3d 452 (7th Cir. 2010) ................................................................................22

*Kirschbaum v. Reliant Energy, Inc.*,
   526 F.3d 243 (5th Cir. 2008) .....................................................................4, 24, 25, 26, 28

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ..............................................................................17

*Kuper v. Iovenko,*
    66 F.3d 1447 (6th Cir. 1995) ........................................................24, 28

*Lancer Offshore, Inc. v. Citco Group Ltd.,*
    2008 WL 926509 (S.D. Fla. Mar. 31, 2008).........................................32

*Lingis v. Motorola, Inc.,*
    649 F. Supp. 2d 861 (N.D. Ill. 2009) ........................................10, 16, 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................33

*Mertens v. Hewitt Assocs.,*
    508 U.S. 248 (1993)........................................................................16

*Moench v. Robertson,*
    62 F.3d 553 (3d Cir. 1995)................................2, 3, 23, 24, 25, 26, 27

*Patten v. N. Trust Co.,*
    2010 WL 894050 (N.D. Ill. Mar. 9, 2010).........................................9, 16

*Pegram v. Herdrich,*
    530 U.S. 211 (2000)........................................................................9, 23

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ....................................3, 5, 7, 8, 9, 24, 25, 26, 27, 28

*Quan v. Computer Sciences Corp.,*
    2010 WL 3784702 (9th Cir. Sept. 30, 2010) ...................................3, 24, 26, 27, 31

*In re RCN Litig.,*
    2006 WL 753149 (D.N.J. Mar. 21, 2006).........................................12, 14

*Stransky v. Cummins Engine Co., Inc.,*
    51 F.3d 1329 (7th Cir. 1995) ...........................................................13

*Steinman v. Hicks,*
    352 F.3d 1101, 1103 (7th Cir. 2003) ...............................................25

*Summers v. State Street Bank & Trust Co.,*
    453 F.3d 404 (7th Cir. 2006) .............................................24, 26, 29

*Tegtmeier v. MW Operating Engineers Pens. Trust Fund,*
    390 F.3d 1040 (7th Cir. 2004) ........................................................9

*Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.,*
    265 F.R.D. 405 (E.D. Wis. 2010) (Stadtmueller, J.).............................33

v

*Vallone v. CNA Fin. Corp.*,
　375 F.3d 623 (7th Cir. 2004) ..............................................................9, 22

*Tierney v. Vahle*,
　304 F. 3d 734 (7th Cir. 2002) .............................................................5, 29

*Varity Corp. v. Howe*,
　516 U.S. 489 (1996)..............................................................................23

*Virginia Bancshares, Inc. v. Sandberg*,
　501 U.S. 1083 (1991).............................................................................13

*In re Wachovia Corp. ERISA Litig.*,
　2010 WL 3081359 (W.D.N.C. Aug. 6, 2010)................................24, 26, 29, 30

*Wright v. Oregon Metallurgical Corp.*,
　360 F.3d 1090 (9th Cir. 2004) .............................................................28

## STATUTES

29 U.S.C. 1022 ..........................................................................................16

29 U.S.C. 1104 ...............................................................................23, 25, 31

29 U.S.C. 1105 ..........................................................................................31

29 U.S.C. 1107 .......................................................................................3, 23

29 U.S.C. 1132 ..........................................................................................33

## OTHER AUTHORITIES

29 C.F.R. § 2550.404c-1(c)(4)....................................................................17

Federal Rule Civil Procedure 12(b)(6) .....................................................3, 8, 9

Rest. (2d) of Trusts § 164 (1957)................................................................23

Case 2:10-cv-00311-JPS   Filed 10/22/10   Page 7 of 42   Document 23

# INTRODUCTION

The M&I Company Stock Fund (the "M&I Stock Fund" or the "Fund") is an Employee Stock Ownership Plan (an "ESOP"), the purpose of which is to enable M&I employees to invest in M&I stock. The Fund is one of twenty-two investment options offered to employee-participants in the M&I Retirement Program (the "Plan"), a 401(k) plan. In the course of the economic turmoil that has engulfed the financial markets in recent years, the price of M&I stock has fluctuated dramatically and experienced a pronounced overall decline—as has been true of so many companies in the financial services sector. Largely on the basis of that decline, plaintiffs allege that M&I stock was not a "prudent" investment option within the meaning of the Employee Retirement Income Security Act ("ERISA"), and not one in which Plan participants should have been permitted to invest. Plaintiffs assert that the defendants somehow breached a fiduciary duty by failing to violate the express dictates of the Plan and failing to peremptorily deny participants a *choice* over whether to continue to invest a portion of their retirement savings in their own company's stock.

Although the Consolidated Complaint ("Complaint") is lengthy, it does not come close to satisfying the pleading requirements for plaintiffs' purported claims. At bottom, the Complaint is little more than an inappropriate exercise in 20/20 hindsight, based on a mere chronological recitation of M&I's own public disclosures as the deterioration in financial markets progressed, especially during 2008. As numerous other courts have held, when faced with similar allegations, this type of pleading fails for several reasons.

*First*, in an attempt to suggest that Plan participants who voluntarily invested in the Fund were somehow misled, plaintiffs premise their claims of disloyalty and imprudence in part on alleged misrepresentations and non-disclosures. *See, e.g.,* Compl. ¶¶ 139, 152-53. But these claims do nothing more than quote or paraphrase various statements about M&I's business coupled with unsupported conclusions that they were false or misleading. With respect to reports about actual financial results, for example, plaintiffs merely quote the reports without

1

alleging *any* facts demonstrating that the reported results were in any way inaccurate. Compl. ¶¶ 79, 93, 98. Similarly, with respect to business forecasts, plaintiffs do not allege that the individuals who made the forecasts did not genuinely believe them to be reasonable, much less allege any facts supporting such an assertion. And as for defendants' alleged nondisclosures, plaintiffs simply fail to identify any *fact* that any defendant was legally obligated, but failed, to disclose to participants. Instead, plaintiffs essentially claim that defendants failed to characterize M&I's business in the pejorative terms they use in their Complaint. However, ERISA creates no such obligation on the part of fiduciaries. Moreover, the Seventh Circuit requires that, in order to state an ERISA claim for alleged misrepresentations or omissions, a claimant must allege that the defendant fiduciaries deliberately sought to mislead participants; negligence does not suffice. Plaintiffs allege no such facts and for this additional reason, their disclosures and omissions claim should be dismissed.

*Second*, plaintiffs contend that even if Plan participants were not misled, M&I stock was an "imprudent" plan investment, such that the fiduciaries should have taken the extraordinary step of disobeying the express terms of the Plan in order to eliminate the Fund as a plan investment. Compl. ¶ 151. But this claim fails because where, as here, the plan that *requires* the fiduciary to offer employer stock as an investment option, the fiduciary's decision to permit the plan to continue to offer and hold company stock is *presumed* to be prudent—as every court of appeals to consider the issue has held. *E.g.*, *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995). This presumption recognizes that there is a significant difference between a fiduciary who has been granted unfettered discretion to select investment options and one who is subject to a plan *dictate* to provide a particular investment option (and who risks substantial liability if he were to ignore the plan's requirements). This significant difference in degrees of discretion in turn alters the nature of and standard for the substantive inquiry into whether the decision to offer a given investment option was prudent. Nor is it any answer to claim that an undiversified fund containing only company stock is "too risky," even if mandated by terms of a plan; ERISA itself explicitly permits ESOP funds, recognizing that they serve "other purposes" from other types of

investments, and that this purpose—employee ownership of an employer's stock—is a "goal in and of itself." *Moench*, 62 F.3d at 568; *see also* 29 U.S.C. § 1107(d)(6)(A). Accordingly, to overcome the presumption of prudence that attaches when a plan requires company stock as an investment option, a plaintiff must present sufficient evidence to establish circumstances so dire and extreme that a fiduciary "could not have reasonably believed" that "continued adherence" to the plan's directions to invest in company stock—even in light of its purposes—"was in keeping with the settlor's expectations of how a prudent trustee would operate." *Moench*, 62 F.3d at 571. The Seventh Circuit has cited this standard (and *Moench* in general) with approval. *See Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008). To survive a motion under Rule 12(b)(6), a complaint must allege facts that would be sufficient, if true, to meet this standard. *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848083, at *10 (S.D.N.Y. Mar. 3, 2009). Moreover, the required showing "varies directly with the strength of a plan's requirement that fiduciaries invest in employer stock." *Quan v. Computer Sciences Corp.*, 2010 WL 3784702, at *9 (9th Cir. Sept. 30, 2010). When the plan strongly mandates investment in employer stock, the burden is extremely high, and in all circumstances, the presumption is "difficult to rebut." *Id.*

The M&I Plan contains an exceptionally strong command to invest in M&I stock. The Plan not only required investment in M&I stock (Plan § 16.02(b)), it directed the fiduciaries *not* to divest the company stock even if M&I experienced rough financial waters. In fact, the Plan expressly contemplated that there could be circumstances in which "M&I's business and the value of the M&I fund could decline significantly," but, even then, the Plan's declared intent was to maintain the investment in M&I stock. Because of the strength of the Plan's requirement to invest in company stock plaintiffs must do far more than simply allege a substantial decline in M&I's fortunes.

The Complaint comes nowhere close to meeting this burden. The factual allegations in the Complaint allege no more than what could be said of any company whose stock price declined significantly in recent times: the business was subject to certain risks based on market conditions; market conditions worsened; the stock price declined. Plaintiffs plead *those* facts in

3

great detail, but they fail even to *suggest* the existence of the type of conditions that courts require to overcome the presumption of prudence, such as circumstances casting doubt on the company's continued viability. *E.g.*, *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 255 (5th Cir. 2008) (holding that a company's "viability as a going concern" should be threatened before a court overrides the presumption of prudence). In the end, all plaintiffs have alleged is the sort of market decline that section 16.02(f) of the Plan expressly anticipated, and for which the settlor explicitly directed that the Plan fiduciaries *not* divest the stockholdings.

*Third*, plaintiffs have alleged claims relating to three other plans, but the only mention of those plans is in the introduction to the Complaint. There is a good reason plaintiffs do not make much of this—they were not participants in any of those plans. As a result, they lack standing to bring any claim on behalf of the participants in those plans.

For these reasons, and for the additional reasons stated below, the Complaint fails to allege facts sufficient to state a claim under ERISA. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Defendants thus respectfully submit that the Complaint should be dismissed in its entirety and with prejudice.

## STATEMENT OF FACTS

### I.    THE M&I PLAN

The M&I Retirement Program ("Plan" or "M&I Plan") is a 401(k) defined contribution plan sponsored and administered by M&I Bank for the benefit of its employees. Compl. ¶¶ 32-33.[1] Each employee who chooses to participate in the M&I Plan (a "participant") is permitted to contribute a portion of his or her pre-tax income to the M&I Plan, and to invest that personal contribution in any of the M&I Plan's 22 different investment options. Jan. 2010 Summary Plan

---

[1] Plaintiffs purport to be bringing claims on behalf of not only the M&I Plan, but also three other 401(k) plans sponsored by M&I Bank. Compl. at 1. The Complaint alleges that "[t]he other Plans' governing documents are substantially similar unless noted herein" (*id.* ¶ 12 n.1), and plaintiffs do not allege any differences (in fact, they do not even mention these plans after the Complaint's introduction). Thus, for purposes of this motion, Defendants will discuss the M&I Plan. Further, as explained below, because plaintiffs do not, and cannot allege that they were participants in any of these other plans, they lack standing to assert claims under these other plans.

Description ("SPD") (Ex. 1) at 15-20.[2] One of the investment options—and the one at issue in the case—is the M&I Company Stock Fund (the "M&I Stock Fund" or the "Fund"), which is an ESOP that invests exclusively in M&I stock. Throughout the class period, participants were permitted to transfer any of their M&I Stock Fund holdings into any other Plan investment option of their choice. *Id.* at 12.

The Plan's Investment Committee has discretion to determine most of the investment options that will be offered to participants, (Ex. 2 § 16.02(c); Ex. 3, Sept. 28, 2005 Amend.), which currently include a number of diversified mutual funds (Ex. 1, at 15-20). The Plan, however, does not confer such discretion with respect to the M&I Fund; rather, it specifically mandates that an "M&I Fund" "shall be" included as one of the investment options. Ex. 2 § 16.02(b); Ex. 3, Sept. 28, 2005 Amend. The Plan provides that the company stock fund shall be an ESOP. Ex. 2 § 28.01(a); Ex. 3, Mar. 29, 2006 Amend. The composition of the M&I Fund is mandated as well; the Plan provides that the M&I Fund "shall be invested entirely in common stock of Marshall and Ilsley Corporation," except for "such small portion thereof" as is necessary to maintain sufficient liquidity for orderly Plan administration. Ex. 2 § 16.02(b); Ex. 3, Sept. 28, 2005 Amend. The Plan makes clear that "the settlor of the Plan and Trust, intends and declares that neither the Committee nor any Plan fiduciary shall have any authority or ability to cause the M&I Fund to be invested in anything but M&I stock." Ex. 2 § 16.02(f); Ex. 3, Sept. 28, 2005 Amend.

Unlike many 401(k) plans, the M&I Plan has a specific provision that declares the settlor's intent in offering the M&I Fund, and it states as follows:

> Marshall & Ilsley Corporation, as the settlor of the Plan and the Trust, hereby declares that its intent and purpose in creating the M&I Fund is to align the interests of Plan

---

[2]On a motion to dismiss, a court may consider documents that are referenced in the complaint and central to the allegations, such as ERISA plans and SPD, as well as matters of public record, including stock prices and publicly filed disclosures, such as SEC filings. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (judicially noticing plan documents and prospectuses filed with the SEC), *citing Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Pugh*, 521 F.3d at 701 (judicially noticing stock prices); *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 854-56 (S.D. Ohio 2009) (considering stock prices and SEC filings).

Participants with Marshall & Ilsley Corporation. . . . Marshall & Ilsley Corporation believes that its success as an entity and the performance of the M&I Fund will both be enhanced and facilitated in the long run by such alignment. At the same time, Marshall & Ilsley Corporation recognizes that the performance of a business fluctuates and the valuation of stock fluctuates. As a result, it is possible that M&I's business and the value of the M&I Fund could decline significantly (even to the point where Marshall & Ilsley Corporation's ongoing viability comes into question). . . . Marshall & Ilsley Corporation believes that, should it suffer reversals of fortune, the alignment of the interests of Plan Participants and Marshall & Ilsley Corporation may be the very thing which will enable Marshall & Ilsley Corporation to again prosper. In sum, Marshall & Ilsley Corporation, as settlor of the Plan and Trust, hereby declares that it is its intent and command that there can be no change in circumstances or event (no matter how dire) which would allow the Committee or any other Plan fiduciary to shift investment of the M&I Fund into investments other than M&I stock[.]

Ex. 2 § 16.02(f); Ex. 3, Sept. 28, 2005 Amend.

## II.     THE PARTIES.

Plaintiffs are two former participants in the M&I Plan. Compl. ¶ 1. Defendants are M&I, the Plan's Investment Committee and its members, the Committee of the M&I Retirement Program and its members, and Dennis Kuester, M&I's former Chairman and Chief Executive Officer. *Id.* ¶¶ 11-24. All of these persons and entities are alleged to be fiduciaries of the M&I Plan. *Id.*

## III.    SUMMARY OF CLAIMS AND ALLEGATIONS

Plaintiffs allege that during the putative class period, from November 10, 2006 to April 21, 2010, M&I stock was an imprudent, "unduly risky" and artificially inflated investment. *Id.* ¶¶ 25, 74. According to plaintiffs, M&I had been a traditionally risk-averse Wisconsin bank, but had strayed "from its core competencies into riskier regions," through its acquisitions in 2005 and 2006 of subsidiary banks in Florida and Arizona (*id.* ¶¶ 76, 78, 95, 103, 139, 143), which increased M&I's existing presence in those markets (*e.g.,* Nov. 10, 2005 8-K (Ex. 4) at 5-6).[3] Although plaintiffs allege that these acquisitions led to M&I's making "risky loans" and impaired M&I's reputation for "solid loans" (Compl. ¶¶ 139, 143), they allege no facts challenging any of M&I's specific lending practices, apart from allegations that the Florida and

_____
[3] The court may judicially notice M&I's SEC filings on a motion to dismiss. *See supra* note 2.

Arizona banks held residential and commercial real estate loans in their respective markets (*e.g.,* *id*. ¶¶ 76, 78, 84, 95-96, 139, 143). Plaintiffs allege that these Florida and Arizona loans eventually resulted in "significant net loss and credit-quality deteriorations," repeated debt and equity downgrades, and "serious concerns" about "capital levels" and "ever-increasing reserves," which plaintiffs conclude, led to "dire financial circumstances for the Company" and the "stead[y] decline[]" of M&I's stock price. *Id.* ¶¶ 138-39. Although plaintiffs point out that the stock price declined during the class period, the Complaint significantly exaggerates the extent of that decline, incorrectly asserting a decline of 89% (*id.* ¶ 138) when the actual decline was substantially less.[4]

Notwithstanding that the Complaint includes a litany of M&I's own disclosures detailing the existence of negative developments and their associated negative impacts on M&I's financial performance and prospects, *see,* below pp. 17-22, plaintiffs also allege that defendants violated disclosure duties to participants. Specifically, plaintiffs assert that M&I somehow "conceal[ed]" and "fail[ed] to provide complete and accurate information" about M&I's "true financial and operating condition" and its "future outlook," "fostered a positive attitude toward the Company's stock," omitting "material facts . . . necessary to make the statements . . . not misleading." Compl. ¶¶ 74, 139, 152.

---

[4] The claim of an 89% decline is erroneous and overstated for two reasons. *First,* plaintiffs' calculations are mathematically incorrect. The stock price was $46.92 on the first day of the class period and $9.94 on the last day (Compl. ¶ 25; Hist. Stock Prices (Ex. 5) Nov. 10, 2006 & April 21, 2010), which is a 79% decline. *See Pugh*, 521 F.3d at 701 (taking judicial notice of stock prices); *accord Huntington Bancshares*, 620 F. Supp. 2d at 851. *Second,* and of greater significance, even though plaintiffs acknowledge that M&I spun off its Metavante Corp. subsidiary during the class period (*see* Compl. ¶ 87), they fail to account for the value of the new stock participants received from the spin-off. On the day that Metavante was spun off, the price of M&I stock of course declined (as one would expect when a corporation splits itself), but that decline was offset by the fact that each M&I shareholder received 0.33 shares of the new Metavante stock for each share of M&I stock. *See* Nov. 7, 2007 8-K (Ex. 6) at 2. As a result, the value of a participant's holdings then consisted of both (i) the value of the M&I stock *plus* (ii) the value of the Metavante stock (which, as a result of a subsequent merger between Metavante and FIS is now equivalent to 1.35 shares of FIS stock, or $11.49 based on the publicly reported price of FIS as of the last day of the class period). Oct. 21, 2009 MV S-8 (Ex. 7) at 2. Assuming that participants held the Metavante/FIS stock through the end of the class period and that value is taken into account (which the Complaint neglects to do), each shareholder would have held an additional $11.49 in value on the last day of the class period, for a total value of $21.43 per share ($9.94 + $11.49 = $21.43) . Ex. 5, April 21, 2010. Using these figures, the decline in M&I's stock price would have been was 54% during the class period (declining from $46.92 to $21.43), not 89%.

Based on their allegations, plaintiffs assert two primary theories of liability. First, plaintiffs allege in Count I that all defendants breached their ERISA fiduciary duties of loyalty and prudence by allowing participants to make or maintain M&I stock investments in their M&I Plan accounts during the putative class period. *Id.* ¶¶ 146-55. Although fashioned as a single count, the claims contained in Count I actually rest on two sets of allegations. One set relates to alleged misrepresentations or misleading nondisclosures made to Plan participants; plaintiffs claim that as a result of being misled, "Participants in the Plans could not appreciate the true risks presented by investments in the Company's stock… ." *Id.* ¶ 152. The other set of allegations underlying Count I suggests that offering an investment option in Company stock was imprudent in any event because doing so "did not serve the Plans' stated purpose and was clearly too risky for retirement savings." *Id.* ¶ 151. These two prongs of Count I are respectively addressed in sections I and II below; neither comes close to being sufficient.

Second, plaintiffs' remaining claims are derivative in nature, and premised on the non-existent primary breaches alleged in Count I. These remaining claims include (a) plaintiffs' claim in Counts I and II that all defendants are liable as "co-fiduciaries" who participated in, were aware of, or concealed the (alleged) breaches by others but "made no effort to remedy them," and (b) their claim in Count II that defendants Kuester and M&I "[f]ail[ed] to adequately monitor other fiduciaries." *Id.* ¶¶ 153, 163. None of these theories of secondary liability states a claim for relief, both because there is no underlying primary liability and because the alleged secondary liability is inadequately pleaded. The insufficiency of these secondary liability theories is addressed in section III below.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim that is "plausible on its face," with factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Pugh*, 521 F.3d at 699. Allegations that merely state conclusions (even factual conclusions) or unwarranted inferences cast in the *form* of factual

8

allegations may not be credited on a motion to dismiss absent "further factual enhancements." *See Twombly,* 550 U.S. at 555 (Rule 12(b)(6) "requires more than labels and conclusions"); *Iqbal*, 129 S. Ct. at 1950-51 (refusing to credit "bare assertions" that "amount to nothing more than a formulaic recitation of the elements") (citations omitted); *see also Pugh*, 521 F.3d at 699 (affirming dismissal of ERISA action and noting that to survive a motion to dismiss, a plaintiff must plead "more than labels and conclusions").

## I.    AS A MATTER OF LAW, COUNT I FAILS TO STATE A CLAIM FOR BREACH OF ANY DISCLOSURE DUTIES.

Plaintiffs claim that defendants breached their duties of loyalty and prudence by "failing to provide complete and accurate information regarding [M&I]'s true financial condition and the Company's concealment of the same and, generally by conveying inaccurate information regarding the Company's future outlook," which caused "the market price of M&I common stock" to be "artificially inflated." Compl ¶¶ 74, 139, 152. Ironically, the Complaint purports to describe M&I's supposedly true financial condition by quoting from *M&I's own* statements about its performance and prospects, which detail the challenges facing the company. *See*, *e.g.*, *id*. ¶¶ 77, 79, 81, 83-87, 90, 92, 98, 101, 105, 109, 113, 117, 118, 124, 126, 133. The Complaint is virtually silent with regard to identifying specific misrepresentations and omissions, and the sparse allegations that do exist (*id.* ¶ 79, 93, 98, 139) are woefully inadequate.

To state a claim for a misrepresentation or omission by an ERISA fiduciary in the Seventh Circuit, a plaintiff must allege *inter alia* (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations or omissions (*Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000); *In re Harley-Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 953, 967 (E.D. Wis. 2009)); (2) that these representations or omissions were material (*Tegtmeier v. MW Operating Engineers Pens. Trust Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004)), *and* (3) that the defendants *intended* to deceive participants (*Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009); *see also Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004); *Patten v. N. Trust Co.*, 2010 WL 894050, at *10 (N.D. Ill. Mar. 9, 2010)). Significantly, "[m]erely negligent

9

misrepresentations" are not actionable. *In re Gen. Growth Props., Inc.*, 2010 WL 1840245, at *6 (N.D. Ill. May 6, 2010), *quoting Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 874 (N.D. Ill. 2009). Plaintiffs' disclosure claims do not satisfy these standards.

Notwithstanding page upon page of extensive quotations, in alleging the existence of "numerous material misrepresentations" and omissions the Complaint does not specify which statements fall into these categories. Instead, plaintiffs lump all of the statements together and then assert that the entire collection of communications "did not adequately explain the risk and return profile of the Fund," with the purported deficiencies summarized in paragraphs 139 and 152 of the Complaint. The challenged statements and omissions all fall into one of three categories, however: (i) alleged misrepresentations about M&I's actual performance (Compl. ¶¶ 79, 93, 152); (ii) alleged misrepresentations about M&I's projected performance in future periods (*id.* ¶¶ 139(d), 152); and (iii) alleged omissions about various aspects of M&I's business and financial performance (*id.* ¶¶ 74, 139, 152). As shown below, plaintiffs fail to state a claim with respect to any of these categories. As to the two categories of alleged misrepresentations, plaintiffs rely on naked assertions unsupported by facts. As to the omission claim, not only was the information disclosed, but even if it had not been disclosed, ERISA does not require disclosure of the type of information plaintiffs describe. Furthermore, all of these misrepresentation and omission claims fail for the additional reason that plaintiffs do not and cannot allege that defendants *intentionally* misrepresented or omitted any information. Each of these arguments is explained further below.

A. Plaintiffs Fail to Plead Actionable Misrepresentations About M&I's Actual Performance.

Plaintiffs assert that defendants failed "to provide complete and accurate information regarding the Company's true financial condition." *Id.* ¶ 152. These conclusory allegations are no more than labels and do not state a claim for relief. *See Huntington Bancshares*, 620 F. Supp. 2d at 853 n.11, 854; *see also In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *20 (S.D.N.Y. Aug. 31, 2009) (dismissing complaint, holding as insufficient allegations that defendant bank

failed to provide "complete and accurate information," regarding the bank and its stock, and failed to "inform participants of the true magnitude of the Company's involvement in subprime lending"); *Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374, 388 (S.D.N.Y. 2010) (granting defendants' motion for judgment on the pleadings, holding that "plaintiffs have failed to point to any language . . . that is materially misleading"). And plaintiffs' allegations regarding the only two specific statements about M&I's actual performance that they criticize (Compl. ¶¶ 79, 93), are plainly deficient.

In paragraph 79, plaintiffs claim that M&I's January 16, 2007 report of its profits was somehow false because "these profits were largely illusory and, in fact, began to show cause for concern." *Id*. ¶ 79. But this is just a naked assertion; plaintiffs allege no facts suggesting that the reported amount of profits was inaccurate. Instead, plaintiffs point to M&I's statements in the same report about non-performing loans, but the existence of non-performing loans does not somehow render statements about M&I's actual profits false.

Plaintiffs' allegations in paragraph 93 about M&I's July 2008 report of a "strong capital position" fare no better. Plaintiffs note that in July 2008, M&I's CEO stated that "[w]e are disappointed with a loss in the second quarter . . . [but] fortunate that our strong capital position allows us to increase our reserves without cutting our dividend or engaging in a dilutive capital raising transaction." *Id*. ¶ 93. Plaintiffs allege that the statement about M&I's "strong capital position" was also illusory. *Id.* (But plaintiffs fail to allege any facts suggesting that the statement was in any way false or "illusory" when made.) They do not, for instance, allege that, at that time, M&I had planned to engage in any dilutive capital raising transaction or cut its dividend in order to fund the increase in reserves that were being announced.[5] Instead, with the

---

[5] To the extent that plaintiffs attempt to treat the phrase "strong capital position" in isolation, that misleadingly distorts the full context, in which the phrase was used as a way of characterizing M&I's ability to increase reserves at the time without resorting to other measures. And if "strong capital position" were, *arguendo*, inappropriately considered in isolation, the phrase would be a textbook example of corporate optimism, which is neither material nor actionable as a matter of law. *See Gen. Growth Props.*, 2010 WL 1840245, at *10 (holding allegedly misleading statements "expressing optimism and confidence in the Company's financial situation" are not actionable under ERISA); *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statements that are "puffery" are not actionable misrepresentations).

benefit of hindsight, plaintiffs allege the statement was "illusory" because later in early 2009—after the entire financial services industry suffered its largest decline in nearly a century—M&I cut its dividend and took other steps to raise capital. *Id.* ¶ 105. But the statement was a factual description of what M&I had done with its reserves in the second quarter, not a prediction of what would or would not happen later in the year. Moreover, such "fraud by hindsight" allegations are not sufficient to state a claim. *See Edgar v. Avaya*, 2006 WL 1084087, at *9 (D.N.J. Apr. 25, 2006), *aff'd* 503 F.3d 340 (3d Cir. 2007) (dismissing claim based on "nothing more than a hindsight view of the Company's prior statements to support a conclusory allegation that these prior statements were inaccurate and misleading at the time they were made."); *In re RCN Litig.*, 2006 WL 753149, at *11 (D.N.J. Mar. 21, 2006) (dismissing ERISA breach of fiduciary claim where plaintiff "merely look[ed] at . . . statements in hindsight to support the conclusory allegation that these statements were inaccurate and misleading"); *see also Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 660 (7th Cir. 2004) ("No court has held, however, that there is a duty in corporate securities laws to predict accurately events that lie ahead. There is no reason why ERISA should require more."); *Arazie v. Mullane*, 2 F.3d 1456, 1467-68 (7th Cir. 1993) ("'[F]raud by hindsight' is not actionable."), *quoting DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990).

B.    **Plaintiffs Fail to Allege Any Facts Showing That M&I's Projections Contained Misrepresentations.**

Plaintiffs claim that defendants conveyed "inaccurate information regarding the Company's future outlook." Compl. ¶ 152; *see also id.* ¶ 139(d). Once again, plaintiffs do not identify which specific statements supposedly fall into this category. *See Fisher*, 703 F. Supp. 2d at 388 (dismissing a claim where plaintiffs failed to identify an actual statement that was misleading). A review of plaintiffs' allegations reveals only one possible statement concerning "future outlook"—a July 16, 2008 statement by M&I's CFO that "[w]e feel very confident that we'll return to profitability in the third quarter and the fourth quarter." *Id.* ¶ 98. The entirety of plaintiffs' allegations about this statement consists of the following naked assertion, unsupported

by any pleaded *facts* at all: "In reality, the Company had not done nearly enough to account for its bad debt and the Company's chances of near-term profitability were practically non-existent." *Id.* ¶ 99. No plausible claim can be based on this statement for several reasons.

First, the projection of M&I's future performance in the next quarter turned out to be accurate. As the Complaint itself reveals, consistent with the July 2008 prediction of a "return to profitability," the Company made a profit in the third quarter, reporting "results improved from the second quarter" and a net profit (albeit one that was 62% lower than a year earlier). *Id.* ¶ 101. While the fourth quarter did not turn out to be profitable, the fact that in July the Company failed to accurately predict what would happen two quarters later, after the economic tsunami of Fall 2008, says nothing at all to suggest that Smith's statement was "false" when made.

Second, plaintiffs are unable to allege facts suggesting that Smith's statement was false when made because, by its very nature, a projection is inherently uncertain and not a guarantee, and cannot be deemed "false" merely because it eventually turns out to be inaccurate.[6] Instead, as numerous courts have observed, "opinions, predictions, and other forward-looking statements" are actionable only if the speaker "does not genuinely and reasonably believe them." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993); *see generally Virginia Bancshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991); *In re I.B.M. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1333 (7th Cir. 1995).

Plaintiffs apparently are asking this Court to infer from the fact that M&I's bad debt reserves were later increased, that defendants knew the reserves to be inadequate, and the "profitability" potential unattainable, months earlier when the July 2008 statement was made. This naked assertion is based on nothing more than hindsight. Indeed, inaccurately predicting

---

[6] Indeed, M&I's own Putative Class Period disclosures made this clear, noting that the forward-looking statements therein were not guarantees of future performance and were subject to change based on a variety of risk factors. *E.g.*, Dec. 31, 2006 10-K (Ex. 8) at 11-17; Dec. 31, 2007 10-K (Ex. 9) at 10-16.

bad debt and reserves is precisely the kind of matter that courts have said does not by itself support a hindsight inference of falsity. *See DiLeo*, 901 F.2d at 627 (in case alleging understated reserves due to bad debts: "[i]f all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence."); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (allegation that bank failed to establish adequate reserves for loan losses "in essence tr[ies] to penalize banking institutions for failing to show greater clairvoyance" (internal quotations omitted)); *accord Huntington Bancshares*, 620 F. Supp. 2d at 853 n.11. The Complaint is devoid of allegations suggesting that M&I was somehow aware of any shortfalls in its bad debt reserves as of July 2008. Instead, without tying them directly to Smith's July 2008 statement, the Complaint recites developments that occurred months later, during and after the economic tsunami that affected the entire financial services industry in the fall of 2008. *See, e.g.*, Compl. ¶¶ 101, 104-05, 109. And the Complaint contains no allegations suggesting that Smith (or anyone else at M&I) presciently foresaw the global economic crisis and its particular impact on M&I as of July 2008, let alone falsely made predictions he did not believe. Thus, plaintiffs' hindsight assertions regarding defendants' supposedly false statements about its outlook should be dismissed. *See In re Bausch & Lomb Inc. ERISA Litig.*, 2008 WL 5234281, at *6 (W.D.N.Y. Dec. 12, 2008) (dismissing "broad allegations" that defendants issued misleading statements about the Company's financial condition because plaintiffs were essentially arguing "in hindsight"); *Johnson v. Radian Group, Inc.*, 2010 WL 2136562, at *13 (E.D. Pa. May 26, 2010) (plaintiff's reliance on subsequent statements about the actual amount of certain margin calls to demonstrate the inaccuracy of previous statements was insufficient); *Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222, 230 (W.D.N.Y. 2002) (dismissing ERISA claim, noting that the court had to evaluate the Committee's actions when made and "not with perfect hindsight").[7]

---

[7] *See also Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 465-66 (D.N.J. 2008) (the fact "[t]hat Defendants' optimistic view of the merger was not ultimately borne out does not mean that, at the time the statements were made, Defendants possessed information to the contrary"); *In re RCN Litig.*, 2006 WL 753149, at *11 (dismissing ERISA disclosure claim because plaintiffs "merely look[ed] at [certain] statements in hindsight").

Third, Smith's statement was not made in a fiduciary capacity. Rather, Greg Smith, M&I's CFO, who is not even alleged to be a Plan fiduciary, made the statement during a quarterly earnings call that was neither directed at plan participants nor incorporated by reference into plan documents. Compl. ¶ 98. As such, it cannot be the basis for an ERISA claim. *See Harley-Davidson*, 660 F. Supp. 2d at 967 (holding that "statements made to the market in general," such as conference calls, are "insufficient to give rise to fiduciary liability"); *Gen. Growth Props.*, 2010 WL 1840245, at *10 (dismissing misrepresentation claim, holding that conference calls "expressing optimism and confidence in the Company's financial situation" are " in [no] way connected to Plan Benefits").

C.    Plaintiffs' Omission Claims Fail Both Because Defendants
      Were Not Required to Disclose the Allegedly Omitted Information and
      Because the Information Was Disclosed.

Plaintiffs also contend that defendants did not adequately disclose (i) that M&I had strayed "from its core competencies into riskier regions, . . . ma[king] risky loans in an attempt to foist profits," (ii) the company was experiencing "significant net loss and credit-quality deteriorations," (iii) that there were "serious concerns about the Company's capital levels and seemingly ever-increasing reserves," (iv) that its "long-developed reputation for making solid loans suffered significantly as a result of the Company's imprudent lending practices," and (v) the "debt and equity were repeatedly downgraded" M&I experienced. Compl. ¶¶ 74, 139. These allegations fail to state a claim under ERISA because (i) ERISA imposes no duty to disclose the allegedly omitted information, and (ii) in any event, stripped of the accompanying pejorative descriptions, the supposedly undisclosed information was either clearly disclosed by M&I itself or a matter of public record.

1.    **ERISA does not require disclosure of the type of information plaintiffs have identified.**

Plaintiffs allege that defendants omitted information about M&I's financial condition that supposedly they were required to disclose in the SPD or in SEC filings incorporated into the SPD. Compl. ¶ 139. But this claim fails as a matter of law because ERISA provides an explicit

15

and exhaustive list of what must be disclosed in a Plan's SPD, and the list does not include the type of information mentioned in paragraph 139. *See* 29 U.S.C. § 1022(b). Furthermore, because ERISA is a "comprehensive and reticulated statute," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993), courts repeatedly have rejected attempts to expand ERISA's disclosure obligations beyond these explicit statutory requirements. *See, e.g., George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992, 1012 (N.D. Ill. 2010) ("Plan fiduciaries do not have a duty to disclose more information than ERISA's notice provisions require."); *Citigroup*, 2009 WL 2762708, at *21 (holding it is "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure").

There is no duty under ERISA to continuously disclose facts relating to a company's general business condition. *Citigroup*, 2009 WL 2762708, at *21; *Patten*, 2010 WL 894050, at *10; *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 866 (N.D. Ill. 2009) (rejecting nondisclosure claims, holding that participants are not "entitled to receive daily or weekly disclosures with the most up-to-date information regarding the company's performance or the performance of its specific products"); *Lingis*, 649 F. Supp. 2d at 876 ("Creating a standard that requires Plan fiduciaries 'to continuously gather and disclose nonpublic information bearing some relation to the plan sponsor's financial condition' would 'extend [ ] the statutory language [of ERISA] beyond [its] plain meaning.'") (alterations in original) (citations omitted); *Gen. Growth Props.*, 2010 WL 1840245, at *10 (same). Indeed, any such requirement would inappropriately turn ERISA into a free-floating set of disclosure obligations that go far beyond anything required even by the federal securities laws. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (holding that the securities laws do not require "continuous disclosure" or "disclos[ure of] all information material to stock prices as soon as news [is known]")

Nor are fiduciaries required to disclose information concerning specific Plan investment options. *Lingis*, 649 F. Supp. 2d at 875-76 (holding that "ERISA fiduciaries' disclosure obligations are not limitless" and impose "no duty to generally share additional information about any of the various investments—including the [company] Stock Fund"). Requiring such

disclosure would essentially "transform fiduciaries into investment advisors," something ERISA specifically disavows. *Citigroup*, 2009 WL 2762708, at *21-22 (holding ERISA does not require fiduciaries "to opine on the stock's condition" or to provide "information about the financial status of plan investments" or "financial information about companies in which participants may invest"), *citing Edgar*, 503 F.3d at 350; *see also* 29 C.F.R. § 2550.404c-1(c)(4) ("A fiduciary has no obligation . . . to provide investment advice" to plan participants).

        2.     **Plaintiffs' omission claims fail because the allegedly omitted information was disclosed.**

Even assuming, *arguendo*, that defendants had a duty to disclose the supposedly withheld information, plaintiffs' omission claim is deficient because Defendants disclosed the very information on which the claim is predicated.

A fundamental problem with all of plaintiffs' omission claims is that they confuse disclosures of *facts* with disclosures of pejorative characterizations about the facts. For example, if a company reports that it lost $1 million in the prior quarter, the disclosure is not converted into an actionable omission simply because the company failed to tell investors that the $1 million loss was "really severe." The disclosure of the $1 million loss is sufficient. This is exactly the problem with plaintiffs' claims, which conclusorily complain about a failure to attach pejorative or pessimistic characterizations to disclosed facts. Even under the securities laws, there is no requirement that a company cast a negative gloss on its disclosed activities. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public such statements are immaterial as a matter of law."). Stripped of the pejoratives, each of the items of information about which plaintiffs complain was amply disclosed such that plaintiffs' claims fail as a matter of law.

Expansion into "riskier regions" and making "risk[ier] loans" (Compl. ¶ 139(a)). For example, plaintiffs allege that M&I did not adequately explain that it had "strayed far from its core competencies into riskier regions." But this is little more than pejorative verbiage; all of the

facts underlying this verbiage were disclosed. M&I disclosed in every quarter during the class period that its "overall strategy is to drive earnings per share growth by: (1) expanding banking operations not only in Wisconsin but also into faster growing regions beyond Wisconsin[.]" *E.g.,* June 30, 2006 10-Q (Ex. 10) at 28; Sept. 30, 2006 10-Q (Ex. 11) at 49 (noting M&I's "primary lending areas" (including Wisconsin and Arizona) and that the "vast majority of the assets acquired from Gold Banc are in entirely new markets," including Florida).[8] M&I also specifically disclosed its "significant operations" in the supposedly riskier regions of Florida and Arizona since at least 2003. *E.g.,* Dec. 31, 2003 10-K (Ex. 12) at 9; Ex. 8, Dec. 31, 2006 10-K at 11; Dec. 31, 2008 10-K (Ex. 13) at 10; *see also* Ex. 8 at 27, 52, 79 (noting expansion in Florida market); Ex. 9, Dec. 31, 2007 10-K at 10, 50 (same); Ex. 13 at 93 (listing the concentration of M&I's total loan portfolio by state).

As to the allegedly "risky loans," M&I was similarly forthright about the risks associated with loans acquired in the Florida and Arizona markets and in residential and commercial real estate generally, as well as the impact of such holdings on M&I's finances. Since at least 2003, M&I has included the following disclosure (or substantially similar disclosure) in each of its annual reports:

> M&I's business and earnings are sensitive to general business and economic conditions in the United States and, in particular, the states where it has significant operations, including . . . Arizona . . . and Florida. . . For example, an economic downturn . . . could decrease the demand for loans and other products and services and/or result in a deterioration in credit quality and/or loan performance and collectability.

Ex. 12, 2003 10-K at 9.

<u>Net Loss/Credit Quality Deteriorations (Compl. ¶ 139(b)).</u> M&I disclosed these facts (*i.e.*, chargeoffs, allowances, losses, non-performing loans) in each quarterly and annual report filed during the class period. *E.g.*, Mar. 31, 2007 10-Q (Ex. 14) at 2, 15, 17, 24-26, 32-34; Mar. 31, 2008 10-Q (Ex. 15) at 2, 18, 20, 28-33, 39-41; Mar. 31, 2009 10-Q (Ex. 16) at 2-4, 11-12, 15-

---

[8] The court may judicially notice M&I's SEC filings. *See supra* note 2.

16, 27-29, 31, 34-39, 45-47; *see also, e.g.,* Ex. 8, 2006 10-K, at 24, 37-40, 58, 79-81. M&I also continually and specifically disclosed the impact that the housing crisis was having on its loan portfolio. In March 2007, shortly before M&I's stock reached its highest point ever, M&I disclosed that its "loans . . . associated with banking acquisitions amounted to . . . 22.3% of total consolidated nonperforming loans," and that "[t]he housing slowdown is impacting the performance of some of the Corporation's construction and land development loans" and that such loans "present a higher than normal risk." Ex. 14, Mar. 31, 2007 10-Q, at 26, 33. In September 2007, M&I again disclosed its exposure to residential mortgage and construction loans in Florida and Arizona (and other areas) through charts that identified the value of non-performing loans broken out by state and loan type. *E.g.,* Sept. 30, 2007 10-Q (Ex. 17) at 35-36. By the end of 2007, M&I's annual reports included the following language:

> A substantial portion of M&I's loan and lease portfolio consists of real estate-related loans, including construction and residential and commercial mortgage loans. *As a result, the recent deterioration in the U.S. real estate markets has led to an increase in non-performing loans and charge-offs, and the Corporation has had to increase its allowance for loan and lease losses. Further deterioration in the commercial or residential real estate markets or in the U.S. economy would increase M&I's exposure to real estate-related credit risk and cause the Corporation to further increase its allowance for loan and lease losses, all of which would have a material adverse effect on M&I's financial condition and results of operations.*

Ex. 9, 2007 10-K at 10 (emphasis added); *see also* Ex. 15, Mar. 31, 2008 10-Q at 31-32 ("real estate related loans and more particularly construction and development real estate loans that are primarily concentrated in the west coast of Florida and Arizona, have been the primary contributor to the increase in nonperforming loans and leases and net charge-offs in recent quarters . . . [and] the majority of . . . nonperforming loans"). M&I also disclosed that its liabilities concerning "higher risk segments within its real estate portfolio, such as the volatile real estate markets in the west coast to Florida and Arizona" were likely to increase:

> Management expects the stresses of the national housing markets will *at least* continue through the remainder of 2008 . . . the ultimate losses could be significantly different from those currently estimated. Rapidly changing collateral

> values, general economic conditions and numerous other factors continue to create volatility in the housing markets and have increased the possibility that additional losses may have to be recognized with respect to the Company's current nonperforming assets. As a result of the present volatility in the housing markets, *management is not providing guidance with respect to the allowance for loan and lease losses or the expect provision for loan and lease losses for future quarters*.

Ex. 15, Mar. 31, 2008 10-Q at 33 (emphasis added); *see also* June 30, 2008 10-Q (Ex. 18) at 27 ("The ongoing deterioration in the national residential real estate markets continued to adversely affect the Corporation's loan and lease portfolio during the second quarter.").

Capital Levels and Reserves (Compl. ¶ 139(c)). Plaintiffs contend that Defendants failed to disclose "serious concerns" by unnamed persons about capital levels and reserves. But again, the term "serious concerns" is just a pejorative characterization; and M&I disclosed the facts about these subjects in each quarterly and annual report filed during the class period. *E.g.,* Ex. 14, Mar. 31, 2007 10-Q, at 2, 15, 17, 24-26, 30-34; Ex. 15, Mar. 31, 2008 10-Q, at 2-3, 18, 20, 28-33, 36-41; Ex. 16, Mar. 31, 2009 10-Q at 2-3, 15-16, 27, 34-39, 41-47; *see also, e.g.,* Ex. 8, 2006 10-K, at 37-40, 58, 81, 94. M&I also disclosed that "[t]he market impact of the deterioration in the national residential real estate markets . . . has been substantial . . . If capital markets deteriorate more than management currently expects, the Corporation could experience further stress on its liquidity position and ability to increase assets." Ex. 9, 2007 10-K, at 46.

M&I's "Reputation" for Making "Solid" Loans (Compl. ¶ 139(e)). Plaintiffs assert that defendants failed to disclose that the Company's "reputation for making solid loans suffered significantly as a result of . . . imprudent lending practices." Compl. ¶ 139. Plaintiffs fail to identify precisely what about M&I's reputation should have been disclosed, let alone how a "reputation"—which is by definition a public opinion—could be concealed. At any rate, the Complaint alleges that M&I made a vast number of public disclosures about difficulties facing the banking industry generally and M&I in particular and that the analysts' and ratings agencies' views of M&I (as well as the price of its stock) were a matter of public record, *see id.* ¶¶ 82, 83, 85, 88, 89, 92, 95, 97, 100, 103, 106-08, 110, 112, 114-16, 125, 128-30, 136, 138.

Downgrades related to "poor" loan quality (Compl. ¶ 139(f)).  Again, the term "poor" is just a pejorative, but the facts were disclosed.  In addition, as discussed above, M&I disclosed any issues with regard to its loan and credit quality (*see* above pp. 19-20), as well as its actual debt (*i.e.*, short- and long-term borrowing and deposit liabilities) and equity levels in every quarterly and annual report filed during the class period.  *E.g.*, Ex. 14, Mar. 31, 2007 10-Q, at 2-3, 6, 11, 17, 22-23; Ex. 15, Mar. 31, 2008 10-Q, at 2-3, 6, 20, 28, 36; Ex. 16, Mar. 31, 2009 10-Q at 2, 18, 27; *see also, e.g.*,  Ex. 8, 2006 10-K, at 1, 23-24, 35, 58-59, 87-93.  The Complaint itself cites multiple public disclosures of downgrades related to the nature of M&I's loans.  *See* Compl. ¶¶ 85, 89, 95, 97, 100, 103, 107, 108, 112, 114, 115, 129, 130, 136.  Furthermore, M&I's own filings disclosed that these credit ratings could cause its stock price to be "volatile" (*e.g.*, Ex. 9, 2007 10-K at 14) and adversely affect its liquidity and financial condition:

> The credit ratings of the Corporation and its subsidiaries are important factors in the Corporation's ability to access certain types of liquidity.  A downgrade in the credit ratings of the Corporation or any of its subsidiaries could potentially increase the cost of debt, limit the Corporation's access to capital markets, require the Corporation to post collateral, or negatively impact the Corporation's profitability.  Furthermore, a downgrade of the credit rating of securities issued by the Corporation or its subsidiaries could adversely affect the ability of the holders to sell those securities.

*E.g.*, Ex. 13, 2008 10-K at 12.

*  *  *

In short, not only were defendants under no <u>*ERISA*</u> obligation to disclose these matters, M&I's specific and repeated disclosures on the subjects at issue directly contradict plaintiffs' claims of  material omissions.  In similar circumstances, courts have dismissed claims where the relevant information was disclosed.  *See Huntington Bancshares*, 620 F. Supp. 2d at 856 ("Plaintiffs cannot satisfy their pleading burden by ignoring the content of the disclosures and conclusorily asserting that they were incomplete.") (citations omitted); *In re Constellation Energy Group*, 2010 WL 3221821, at *7-8 (D. Md. Aug. 13, 2010) (dismissing non-disclosure claim where plaintiffs "gloss[ed] over the content of [defendants'] numerous risk disclosures and

fail[ed] to allege what specific information the defendants should have disclosed further"); *see also Hecker*, 556 F.3d at 586 (affirming dismissal of non-disclosure claim alleging failure to disclose revenue sharing arrangement where the overall fees had been disclosed).

      D.      Plaintiffs Fail to Allege Facts Indicating That Defendants *Intentionally* Made Any Misrepresentations or Omissions.

Even if, *arguendo*, plaintiffs had alleged an otherwise actionable misrepresentation or omission (and they have not), their disclosure claims fail for the additional and independent reason that the Complaint fails to plead any facts suggesting that defendants *intentionally* concealed information or made misrepresentations designed to deceive Plan participants. In the Seventh Circuit, an ERISA claim of breach of fiduciary duty due to an alleged misrepresentation or omission requires an intentional misrepresentation or an omission designed to deceive. *Hecker*, 556 F.3d at 585; *Gen. Growth Props*, 2010 WL 1840245, at *8. "[N]egligent misrepresentations are not themselves actionable[.]" *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 471 (7th Cir. 2010). Rather, plaintiffs must show that the fiduciaries "set out to disadvantage or deceive" the participants. *Vallone*, 375 F.3d at 642, by taking "affirmative steps to 'hide, secrete, or withhold [information] from the knowledge of others,'" *Lingis*, 649 F. Supp. 2d at 872 (internal citation omitted) (alteration in original).

Plaintiffs have not even attempted to allege such deliberate misconduct. The Complaint contains no *factual* allegations whatsoever that plausibly suggest defendants acted to intentionally deceive or withhold information from anyone, much less M&I Plan participants. To the contrary, the Complaint sets forth M&I's repeated disclosures about negative developments as they occurred and each and every risk plaintiffs suggest was somehow concealed. *See* above pp. 17-22. As a matter of law, these repeated disclosures negate any inference that defendants acted with intent to deceive. At best, with the benefit of hindsight, plaintiffs suggest that defendants failed to predict the worst economic crisis in nearly a century, but that does not suffice to show intentional misrepresentations. *See DiLeo*, 901 F.2d at 627 ("At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less

rosy. The plaintiff contends that the difference must be attributable to fraud . . . . [but] [i]nvestors must point to some facts suggesting that the difference is attributable to fraud.").

## II. COUNT I FAILS TO STATE A CLAIM THAT DEFENDANTS OTHERWISE BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE.

In addition to the allegations relating to misrepresentations and omissions, plaintiffs' imprudence claim in Count I hinges upon a second set of allegations summarized in paragraph 151 of the Complaint: "Investment in Company stock during the class period clearly did not serve the Plans' stated purpose and was clearly too risky for retirement savings." As discussed below, these allegations are, as a matter of law, patently inadequate to state a claim.

### A. Plan Fiduciaries Are Generally Required to Follow the Plan Documents.

The duties of ERISA plan fiduciaries are similar to those imposed on other fiduciaries by the common law of trusts. *Pegram*, 530 U.S. at 224. Under the common law, a trust fiduciary's primary obligation is to act in accordance with the terms of, and in furtherance of the purposes expressed in, the document that creates the trust. *See Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) ("to act as [a trustee] is to perform the duties imposed . . . by the trust documents") (*citing* Rest. (2d) of Trusts § 164 (1957)). Similarly, under ERISA, fiduciaries must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

ERISA explicitly authorizes employers to establish plans including ESOPs, whose sole purpose is enabling employees to invest in their employer's stock. 29 U.S.C. § 1107(d)(6); *see also Moench*, 62 F.3d at 568. Indeed, such employee ownership is "a goal in and of itself" of ERISA and other statutes. *Moench*, 62 F.3d at 568. Consequently, where an ERISA plan establishes an ESOP, a fiduciary who permits the ESOP to invest in the employer's stock is, in the absence of extreme circumstances, merely doing exactly what she is required to do—that is, furthering a purpose of the plan that is consistent with ERISA.

B.    Where, as Here ERISA Plan Requires Investment Company Stock, There Is a Substantive Presumption That Continued Investment Is Prudent.

Applying the above principles, courts have uniformly held that, where a 401(k) plan requires a plan fiduciary to offer company stock as an investment option, the fiduciary's decision to continue to hold and invest in company stock is *presumed* to be prudent. *See Quan*, 2010 WL 3784702, at *5, 7-8; *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Kirschbaum*, 526 F.3d at 254; *Moench*, 62 F.3d at 568; *Edgar*, 503 F.3d at 347.  This "*Moench* presumption"[9] has been embraced by every court of appeals to consider the question, and the Seventh Circuit too has cited with approval the portion of *Moench* (pages 571-72) that created the presumption.  *See, e.g.*, *Pugh*, 521 F.3d at 701, *citing Moench*, 62 F.3d at 571-72; *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006) (same).  The *Moench* presumption is intended to provide a "substantial shield to fiduciaries when plan terms require or encourage the fiduciary to invest primarily in employer stock." *Quan*, 2010 WL 3784702, at *7.  Moreover, the presumption is substantive in nature, defining the elements of plaintiffs' "imprudence" cause of action in the face of such a plan requirement in a way that differs from the inquiry applicable when a fiduciary acts with unfettered discretion.  *Edgar*, 503 F.3d at 349; *accord In re Wachovia Corp. ERISA Litig.*, 2010 WL 3081359, at *12 (W.D.N.C. Aug. 6, 2010) (collecting cases).

There are several reasons for this presumption.  To begin with, ESOPs serve "*other purposes*" from other pension plans, in that they are "not intended to guarantee retirement benefits, and indeed, by its very nature an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan." *Moench*, 62 F.3d at 568 (emphasis added) (internal citations omitted); *see also Summers*, 453 F.3d at 410.  Thus, evidence that might suggest imprudence in connection with other plans—such as an investment with a high degree of risk—would *not* show that allowing an ESOP to hold an employer's stock failed to

---

[9] This substantive standard is generally known as the "*Moench* presumption" because it originates from *Moench v. Robertson*, 62 F.3d 553, 571-72 (3d Cir. 1995).

further the purpose of an ESOP or was otherwise inconsistent with ERISA.  *See Edgar*, 503 F.3d at 346-47.

In particular, while ERISA fiduciaries *generally* must diversify plan investments "so as to minimize the risk of large losses," ERISA expressly creates an *exception* to this duty for ESOP fiduciaries.  *Moench*, 62 F.3d at 568; *see* 29 U.S.C. §§ 1104(a)(1)(c) and 1104(a)(2).  For this reason, routine second-guessing of a fiduciary's decision to permit an ESOP to hold employer stock would be counter-productive:  "[B]y subjecting an ERISA fiduciary's decision to invest in employer stock to strict judicial scrutiny, we essentially would render meaningless the ERISA provision excepting ESOPs from the duty to diversify" and would "sacrifice the policies behind ESOPs and employee ownership in order to make ESOP fiduciaries virtual guarantors of the financial successes of the [ESOP] plan."  *Moench*, 62 F.3d at 570 (citation omitted); *Edgar*, 503 F.3d at 346 n. 9, *quoting Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003).

Furthermore, a fiduciary's *refusal* to fulfill the express language of an ERISA plan by permitting ownership of an employer's stock through an ESOP would itself expose the fiduciary to liability.  *Edgar*, 503 F.3d at 348-49 ("had [the fiduciary] defendants divested the Plans of Avaya common stock during the Class Period, they would have risked liability for having failed to follow the terms of the Plans."); *cf. Evans v. Akers*, 534 F.3d 65, 68 (1st Cir. 2008) (employer sued for acting imprudently *both* in maintaining the plan's investment in company stock and in later divesting the plan of that same stock).  Thus, the presumption of prudence permits fiduciaries to follow the language of the plan to allow investment in company stock, without placing themselves in the "untenable position of having to predict the future of the company stock's performance.  In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded."  *Kirschbaum*, 526 F.3d at 256; *see also Pugh*, 521 F.3d at 701.

C.    The Presumption of Prudence Can Only Be Overcome In Exceptional
      Circumstances.

The *Moench* presumption is "difficult to rebut."  *Quan,* 2010 WL 3784702, at *9.  To overcome the presumption, a claimant must do more than simply show that the employer's stock did not perform well or that investment in company stock entailed a high degree of risk.  Rather, a plaintiff must plead facts showing that the "fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities."  *Pugh*, 521 F.3d at 701; *Kirschbaum*, 526 F.3d at 250, 256 (holding that the presumption may "only be rebutted if unforeseen circumstances would defeat or substantially impair" the trust's purposes), *citing Moench*, 62 F.3d at 571.  This generally requires a plausible showing that the company faced an excessive risk of an "impending collapse" or other such dire circumstances.  *Summers*, 453 F.3d at 409-11.  In other words, plaintiffs must show that company's "viability as a going concern was . . . threatened" or that it's "stock was in danger of becoming essentially worthless." *Kirschbaum*, 526 F.3d at 255-57 (holding that a "[l]ess than rigorous application of the *Moench* presumption threatens its essential purpose . . . plac[ing a fiduciary] in the untenable position of having to predict the future of the company stock's performance"); *accord Wachovia*, 2010 WL 3081359, at *13 (collecting cases); *see also Quan*, 2010 WL 3784702, at *8 (holding presumption is only overcome by public facts "clearly implicat[ing]" either "the company's viability as an ongoing concern" or showing "a precipitous decline" in stock price "*combined with* evidence that the company is on the brink of collapse or is undergoing serious mismanagement.") (emphasis added).

The evidence needed to rebut the presumption "varies directly with the strength of a plan's requirement that fiduciaries invest in employer stock."  *Quan*, 2010 WL 3784702, at *9. In other words, when an ERISA plan contains language strongly mandating employee stock as an investment option, leaving the plan fiduciaries little discretion to do otherwise, the plaintiffs' burden is extremely high.  *Id*.  This recognition that the stronger the plan mandate, the higher the

plaintiffs' required showing, is consistent with the Seventh Circuit's recognition that the relevant inquiry concerns what a reasonable fiduciary could believe "the plan's drafters would have intended under the circumstances… ." *Pugh*, 521 F.3d at 701. However, regardless of the plan language, a fiduciary's decision to continue to provide a company stock investment option is deemed prudent so long as there is at least "room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock." *Quan*, 2010 WL 3784702, at *8.

        D.      As a Matter of Law, Plaintiffs Fail to Overcome the Presumption of Prudence.

Here, there can be no serious dispute that the *Moench* presumption applies, because the Plan expressly *required* company stock to be offered as an investment option. Ex. 2, Plan § 16.02(b), (d). Indeed, the Plan provides that "neither the Committee nor any other Plan fiduciary shall have the authority or ability to cause the M&I Fund to be invested in anything but M&I stock." *Id.* § (f). Moreover, the Plan contains exceptionally strong language making clear that the fiduciaries were required to offer company stock under virtually any circumstances. *Id.* § 16.02(f). The Plan even recognizes that "it is possible that M&I's business and the value of the M&I fund could decline significantly," but in such circumstances, still directs the Plan fiduciaries to continue to invest in company stock. *Id.* Among published decisions in this area, no plan contains language so strongly requiring the continued investment in company stock.

Because the presumption applies, plaintiffs must allege facts sufficient to overcome the presumption—*i.e.*, facts indicating that the situation M&I faced was so dire that a reasonable fiduciary "*could not have believed reasonably*" that continuing to make the ESOP investment option available to participants was in keeping with the settlor's expectations. *Moench*, 62 F.3d at 571 (emphasis added). Here, the Complaint fails to allege any facts that could satisfy that standard.

Apart from a conclusory allegation that M&I's financial circumstances were "dire" (Compl. ¶ 4), the Complaint alleges no facts plausibly suggesting that M&I's viability as a going concern was threatened at any point during the class period. Much of the Complaint is devoted

27

to reciting the decline in M&I's financial ratings and stock price during the recent period of extreme market volatility. *Id.* ¶¶ 74-138. On the basis of this chronology, plaintiffs conclusorily assert that "[t]he Fund . . . was an imprudent investment" (*id.* ¶ 143), and that a prudent fiduciary would have made a different investment decision.

In short, plaintiffs allege no more than what could be alleged in almost *any* case in which stock held in an ESOP has suffered a significant decline: (i) the company's business was subject to certain risks based on overall business and market conditions; (ii) business and market conditions worsened; and, (iii) as a result, the company's business suffered. Plaintiffs fully avail themselves of the clarity that hindsight often appears to provide, taking the position that an investment can be proved to have been "imprudent" within the meaning of ERISA by evidence that the value of the investment ultimately declined. Yet this is the type of allegation that repeatedly has been held as *insufficient* to state a claim against an ESOP fiduciary. *Pugh*, 521 F.3d at 702; *Kuper*, 66 F.3d at 1459-60; *Huntington Bancshares Inc.*, 620 F. Supp. 2d at 850-51; *see also Edgar*, 503 F.3d at 348-49 (holding as insufficient even with regard to company stock held in a 401(k) plan); *Kirschbaum*, 526 F.3d at 255-56 (same); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (same); *Brieger*, 629 F. Supp. 2d at 863-64 (holding such facts insufficient even without the presumption).

Plaintiffs' main theory of imprudence appears to be predicated on a hindsight review of the stock price movements; in other words, plaintiffs appear to contend that the severity of the resulting stock price decline—which plaintiffs incorrectly allege was 89%[10]—proves that M&I stock was an imprudent investment at the start of the class period. But it is well-established that plaintiffs cannot rebut the *Moench* presumption merely by alleging a decline in stock price— even a very substantial one. *See Brieger*, 629 F. Supp. 2d at 857, 863-64 (fact that "stock price dropped [almost 90 percent] during the class period is not, on its own, conclusive"); *Huntington*

---

[10] As noted in note 4 above, plaintiffs grossly overstate the percentage decline in the stock price, but even accepting their figure as correct, plaintiffs cannot state a claim.

*Bancshares*, 620 F. Supp. 2d at 850-51 (dismissing complaint that alleged a 65 percent decline); *Wachovia*, 2010 WL 3081359, at *13 (dismissing complaint alleging an 87 percent decline, dropping as low as $1.84 per share); *see also Summers*, 453 F.3d at 407-09 (affirming summary judgment to defendants despite 90 percent stock decline). As the Seventh Circuit has made clear, the reason that large stock price declines are not sufficient to show imprudence is because fiduciaries are not required to second-guess the market price of company stock; on the contrary, they risk being sued if they do not follow the plan terms and sell the stock, only to have it bounce back. *See Summer*, 453 F.3d at 410-12.

Plaintiffs' allegations concerning analysts' downgrades of M&I stock likewise do not suggest that the stock was "worthless" or that M&I was on the brink of collapse. *See id.* at 407-08, 411 (affirming summary judgment to defendant, holding plaintiff failed to show excessive risk despite speculation of bankruptcy by the financial press and the company's CEO). Plaintiffs fail to cite a single article even suggesting that M&I was at risk of an impending collapse. Even among the analysts that plaintiffs selectively cite in their complaint, several rated M&I at "neutral" or "market perform" during the class period (Compl. ¶¶ 85, 97, 114, 136)—hardly a sign that the stock was essentially worthless or M&I on the brink of collapse.

Moreover, the ratings that the Complaint mentions actually refute any suggestion that M&I was on the brink of collapse. For example, plaintiffs note that in July 2008, Fitch downgraded M&I's Individual rating to "B" and its short-term IDR rating to F1. Compl. ¶ 95. But a B rating means "strong bank . . . no major concerns" and an F1 rating means "high credit quality."[11]  Fitch Ratings Defs. (Ex. 19) at 18-20, 23. Likewise, the Complaint (¶ 115) refers to M&I's IDR rating in April 2009 being lowered to BBB+, but that rating applies to banks with "good credit quality . . . expectations for default risk are currently low." Ex. 19 at 9, *see also id.* at 18-20. And M&I's ratings held steady in September 2009, when M&I's stock was trading

---

[11] A court may judicially notice publicly available documents referenced in the complaint whose authenticity is uncontested.  *Supra* note 2; *Hecker*, 556 F.3d 582-83, *citing Tierney*, 304 F.3d at 738.

near its lowest point. Compl. ¶ 122; Ex. 19 at 48 (explaining that "ratings watch" indicates that actual ratings are unchanged).

Plaintiffs' remaining contentions regarding the alleged imprudence of M&I stock are summarized in paragraph 143, and none (either independently or collectively) suggests that M&I's viability as a going concern was ever threatened. For example, plaintiffs allege that M&I stock was an imprudent Plan investment because it "had strayed far from its core competencies into riskier regions, . . . ma[king] risky loans in an attempt to foist profits." Compl. ¶ 139. But these allegations simply amount to using hindsight to second-guess M&I's business strategies, and cannot rebut the presumption of prudence. *See Constellation Energy Group*, 2010 WL 3221821, at *5 ("A company's decision to adopt a riskier business model is not in itself a fiduciary decision governed by ERISA" and does not "trigger a duty to divest."); *Wachovia*, 2010 WL 3081359, at *5, 13 (allegations concerning risky loan practices were insufficient to allege imprudence); *Citigroup*, 2009 WL 2762708, at *18 (allegations that "Citigroup adopted imprudent and risky business strategies that resulted in substantial losses," provided "no indication" that company's "viability as a going concern was ever threatened" or that it faced "the type of dire situation" necessary to rebut the presumption of prudence). At best, plaintiffs allege that M&I's business strategy to invest in Florida and Arizona banks performed poorly, but that does not plausibly suggest that M&I's viability as a going concern was threatened.

     E.    The Actions of Other Plan Fiduciaries Further Demonstrate That Plaintiffs' Theory of Imprudence Is Implausible.

Not only have plaintiffs failed to allege facts indicating that no prudent fiduciary would have continued to obey the Plan and allow investment in M&I stock, publicly available information affirmatively demonstrates the contrary. Specifically, the publicly disclosed actions of other fiduciaries, reflected in public securities filings, show that plaintiffs' theory of imprudence is implausible. Throughout the class period, three of the country's largest pension funds continued to invest heavily in M&I stock. *See* Ex. 20 (summarizing 13-F filings for the CA St. Teachers' Ret. Sys., CA Public Employees' Ret. Sys., and the NY State Common Ret.

Fund).  As other courts have concluded, this type of public information is subject to judicial notice and fatal to a plaintiff's attempt to overcome the *Moench* presumption.  *See Huntington Bancshares*, 620 F. Supp. 2d at 851-52.

In fact, during the class period, these three large pension plans *increased* their holdings of M&I stock between 58 and 115 percent.  Each of these pension plans is managed by *fiduciaries*, and the decisions of those fiduciaries belie plaintiffs' assertions that any prudent fiduciary would have viewed M&I stock as an imprudent investment during the class period.  *See Huntington Bancshares*, 620 F. Supp. 2d at 851-52 (dismissing imprudence claim where public information showed that the fiduciaries of large public pension funds continued to invest in the company stock during the class period).  The actions of each of these other fiduciaries show that, at most, throughout the class period, there was "room for reasonable fiduciaries to disagree" about whether to divest from M&I stock, and thus the decision of the M&I fiduciaries cannot be imprudent.  *Quan*, 2010 WL 3784702, at *8; *see also* 29 U.S.C. 1104(a)(1)(B) (measuring prudence by the conduct of "a prudent man acting in a like capacity").

## III.    PLAINTIFFS' RELATED CLAIMS FAIL AS A MATTER OF A LAW.

Plaintiffs' remaining claims for co-fiduciary breach and breach of ERISA's duty to monitor (Compl. ¶¶ 153, 163) should likewise be dismissed for two basic reasons.  First, both claims depend upon a finding by this Court that there was some underlying breach of fiduciary duty.  *See* 29 U.S.C. § 1105(a) (predicate of co-fiduciary liability is a "breach of fiduciary responsibility of another fiduciary with respect to the same plan").  However, as explained above, the Complaint fails to allege any underlying breach of fiduciary duty, requiring dismissal of these two derivative claims.  *See Harley-Davidson, Inc.*, 660 F. Supp. 2d at 968 (where "complaint fails to state a claim that the defendants breached their fiduciary duties . . . related and derivative allegations of breach of a duty of loyalty, duty to monitor and investigate, co-fiduciary liability, and knowing breach of fiduciary duty . . . fail as a matter of law"); *Constellation Energy Group*, 2010 WL 3221821, at *8 (dismissing claims for co-fiduciary

31

breach, failure to monitor, and knowing participation in a breach where plaintiffs failed to plead claims for underlying breaches of duties of prudence and loyalty).

Second, even if, *arguendo*, plaintiffs had sufficiently alleged an underlying breach, these contingent claims are insufficiently pled because they do not allege any specifics about what Plan fiduciaries allegedly knew and did. For example, plaintiffs allege that all defendants breached their co-fiduciary duties by "knowingly participating in, or knowingly undertaking to conceal the other Defendants'" alleged breaches and by "ma[king] no effort to remedy" such breaches. Compl. ¶ 153. These allegations are not only conclusory, they make no attempt to identify who did what. Rather, even though different defendants served on different committees and in different corporate roles with different fiduciary obligations, plaintiffs have lumped all the defendants together without alleging any facts to show what any particular defendant knew, how he concealed or enabled any other defendant's breach, or what he could or should have done to remedy that breach.[12] These conclusory allegations simply fail to meet the pleading standards under *Twombly* and *Iqbal* and must be dismissed. *See Lancer Offshore, Inc. v. Citco Group Ltd.*, 2008 WL 926509, at *10 (S.D. Fla. Mar. 31, 2008) (to plead a claim for co-fiduciary breach, plaintiffs must "identify the breaches of fiduciary duty, the specific defendants with knowledge of the breaches, and identify more specifically how each defendant failed to take reasonable efforts to remedy the breach").

Plaintiffs' duty-to-monitor claim suffers from the same defect. Plaintiffs allege that defendants M&I and Kuester failed to provide the other fiduciaries with information about M&I's "business problems" and "financial condition," preventing them from "completely appreciat[ing] the . . . risk of significant investment" in M&I stock, and resulting in their "imprudent" investments in that stock. Compl. ¶¶ 161, 162. But plaintiffs fail to allege what, if any, additional information M&I and Kuester supposedly had that other fiduciaries lacked. That

---

[12] Although plaintiffs later reiterate the same conclusory allegations of co-fiduciary breach with respect to M&I and Kuester in particular (Compl. ¶163), they allege no additional facts to support that claim apart from what they previously alleged with respect to all of the defendants together.

omission is no surprise, given that plaintiffs' primary liability allegations contradictorily accuse *all* defendants of having been aware of the same allegedly adverse information that they *all* allegedly failed to disclose.  Plaintiffs' conclusory assertions of a "duty to monitor" violation are insufficient to state a claim.

## IV.     PLAINTIFFS LACK STANDING TO ALLEGE CLAIMS ARISING FROM PLANS IN WHICH THEY WERE NOT PARTICIPANTS.

Separate and apart from all the foregoing arguments, this Court should dismiss plaintiffs' claims relating to three other plans mentioned in the introduction to the Complaint because they simply lack standing to assert them.  Though plaintiffs allege claims on behalf of participants in four different ERISA plans (*id.* at 1), they only allege that they were participants in the M&I Plan. *Id.* ¶ 1.  Thus, plaintiffs lack both statutory and constitutional standing to pursue relief on behalf of participants in those other three plans.

With respect to statutory standing, only a participant, beneficiary, fiduciary, or the Secretary of Labor has standing to bring fiduciary breach claims.  29 U.S.C. § 1132(a)(2). Because plaintiffs do not occupy any of those positions with respect to the other plans, they have no statutory standing to bring fiduciary claims.  *See Acosta v. Pac. Enters.*, 950 F.2d 611, 617 (9th Cir. 1991).  With respect to constitutional standing, Article III requires (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  As non-participants, plaintiffs cannot have suffered any injury in fact relating to those other plans.  *See Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405, 413 (E.D. Wis. 2010) (Stadtmueller, J.).  Thus, Plaintiffs' claims regarding the North Star, MSB and NYCE Plans should be dismissed.

## CONCLUSION

For the foregoing reasons, the Consolidated Complaint should be dismissed in its entirety with prejudice.

Dated:  October 22, 2010

Respectfully submitted,

/s/  Howard A. Pollack

Howard A. Pollack (State Bar No. 1014328)
hpollack@gklaw.com
John L. Kirtley (State Bar No. 1011577)
jkirtley@gklaw.com
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

-and-

David F. Graham
dgraham@sidley.com
Mark B. Blocker
mblocker@sidley.com
Rachel B. Niewoehner
rniewoehner@sidley.com
Alison V. Potter
apotter@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2010, I electronically filed the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS** with the Clerk of the Court by using the CM/ECF System which will send a Notice of Electronic Filing to all counsel of record.

/s/  Howard A. Pollack_____