# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

LINDA WHITE, on Behalf of Herself
and a Class of Persons Similarly Situated,

          Plaintiff,

    v.                                     Case No.  10-CV-311

MARSHALL & ILSLEY CORPORATION,
M&I RETIREMENT INVESTMENT COMMITTEE,
PAUL RENARD, DENNIS R. SALENTINE,
JOHNS DOES 1-10, and DENNIS J. KUESTER,
JON F. CHAIT, TED KELLNER, DREW BAUER,
KATHERINE LYALL, JOHN MELLOWES, and
RETIREMENT COMMITTEE OF THE M&I
RETIREMENT PROGRAM,

          Defendants.

──────────────────────────

CHARLENE L. ROUNDTREE, on Behalf of Herself
and a Class of Persons Similarly Situated,

          Plaintiff,

    v.                                     Case No. 10-CV-377

MARSHALL & ILSLEY CORPORATION,
M&I RETIREMENT INVESTMENT COMMITTEE,
PAUL J. RENARD, DENNIS R. SALENTINE,
JOHNS DOES 1-10, and DENNIS J. KUESTER,

          Defendant.

_____

# ORDER

    This is a putative class action pursuant to the Employee Retirement Income

Security Act of 1974, 29 U.S.C. §1001 _et seq._ ("ERISA") by participants in an

employer's 401(k) plan against the fiduciaries of the plan.  Plaintiffs' consolidated

complaint alleges breaches of prudence, loyalty, and other fiduciary duties stemming from defendants' management of the M&I Retirement Program and other plans. This matter is before the Court on defendants' motion to dismiss plaintiffs' consolidated complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Docket #19). For the reasons set forth below, defendants' motion to dismiss will be granted.

## BACKGROUND[1]

This case involves a defined contribution 401(k) plan called the M&I Retirement Program ("Plan" or "M&I Plan") offered by Marshall & Ilsley Corporation ("M&I") to its employees. M&I is a financial services company headquartered in Milwaukee, Wisconsin. During the course of the most recent global financial crisis, M&I's stock experienced a steep decline. It is this decline in the value of M&I stock and the resulting losses to the Plan that are central to the current dispute.

Plaintiffs are two former participants in the M&I Plan and have brought this action on behalf of the M&I Plan and all of its participants and beneficiaries.[2] Defendants are fiduciaries of the Plan, consisting of M&I, the Plan's Investment

---

[1]The facts in this section are taken predominantly from the consolidated complaint and accepted as true for purposes of resolving this motion. The court also has taken judicial notice of filings that the defendants have attached to their motion that are referred to in plaintiffs' complaint and central to plaintiffs' claims, such as ERISA plans and Summary Plan Descriptions, as well as matters of public record, such as SEC filings and stock prices. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

[2]Plaintiffs' consolidated complaint also states claims against defendants on behalf of other 401(k) plans sponsored by M&I, including: (1) the North Star Financial 401(k) Plan; (2) the Missouri State Bank and Trust Retirement Savings Plan; and (3) the NYCE Corporation/Employees Tax Deferred Savings Plan. However, plaintiffs refer to these other plans only in passing. As such, and for purposes of this Order, the court's discussion will focus solely on the M&I Plan.

Committee and its members, the Committee of the M&I Retirement Program and its members, and Dennis Kuester, M&I's former Chairman and Chief Executive Officer. Plaintiffs allege that from November 10, 2006, to April 21, 2010 (the "Class Period"), the Plan offered the M&I Company Stock Fund (the "Fund" or "M&I Stock Fund"), an Employee Stock Ownership Plan ("ESOP") that invests exclusively in M&I stock. Plaintiffs allege that throughout the Class Period, the defendants offered the M&I Stock Fund as an investment option for the Plan and continued to invest assets of the Plan in the Fund and Fund assets in M&I common stock when they knew or should have known it was imprudent to do so. Plaintiffs also allege that during the Class Period, the fiduciaries failed to provide complete and accurate information to the Plan participants regarding M&I's financial condition and the prudence of investing in M&I common stock, thereby depriving participants of the opportunity to make informed investment choices about their retirement savings options. Plaintiffs also state a third claim against M&I and defendant Kuester, arguing these defendants failed to properly appoint, monitor, and inform the other fiduciaries of the Plan.

The following are certain noteworthy aspects of the Plan. Participants in the M&I Plan could contribute up to 50% of their salaries to their individual investment accounts. M&I agreed to make a matching contribution of 50%, up to a maximum of 6% of the participant's compensation, following one year of service. The Plan's Investment Committee was responsible for selecting the investment options that

would be offered to participants. The M&I Plan gave participants full discretion to allocate and reallocate their voluntary contributions among twenty-two diverse investment options, one of which was the M&I Stock Fund. As earlier noted, the M&I Stock Fund is an ESOP that invests exclusively in M&I Stock. Participants were not permitted to invest any more than 30% of their Plan assets in the M&I Stock Fund. In other words, they were forced to diversify. M&I's matching contributions were automatically invested in the M&I Stock Fund.

While the Investment Committee had the discretion to determine most of the investment options that would be offered to participants, under the Plan's governing document, the M&I Stock Fund was a mandatory investment offering designed to "align the interests of Plan Participants with [M&I]." (Potter Decl. Ex. 2 at 13 [M&I Retirement Program § 16.02(f)]) (Docket #20-3). However, no Plan participant was ever required to invest in the M&I Stock Fund.[3] Not only was the Investment Committee required to offer the M&I Stock Fund as an investment option, but M&I, as the Plan's drafter, also made clear that no Plan fiduciary would have "any authority or ability to cause the M&I Fund to be invested in anything but M&I stock." *Id.* Indeed, the Plan provided in pertinent part:

> . . . it is possible that M&I's business and the value of the M&I Fund could decline significantly (even to the point where Marshall & Ilsley Corporation's ongoing viability comes into question) . . . Marshall & Ilsley Corporation believes that, should it suffer reversals of fortune, the

---

[3]While no Plan participant was ever required to invest in the Fund, it should be noted that M&I's matching contributions were fully invested in the M&I Stock Fund, no matter what fund a participant chose as an investment option.

alignment of the interests of Plan Participants and Marshall & Ilsley Corporation may be the very thing which will enable Marshall & Ilsley Corporation to again prosper. In sum, Marshall & Ilsley Corporation, as settlor of the Plan and Trust, hereby declares that it is its intent and command that there can be no change in circumstances or event (no matter how dire) which would allow the Committee or any other Plan fiduciary to shift investment of the M&I Fund into investments other than M&I stock[.]

*Id*. With these facts in mind, the court now turns to the substance of the plaintiffs' claims.

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the plaintiff's complaint by asserting that the claimant failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), claimant's complaint must allege facts sufficient to "state a claim for relief that is plausible on its face." *Justice v. Town of Cicero*, 557 F.3d 768, 771 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). Pleaders must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 1129 S. Ct. at 1940. However, the court construes the complaint in the light most favorable to the claimant, accepts as true all well-pleaded facts alleged, and draws all possible inferences in the claimant's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Yet, the court need not accept as true "legal conclusions." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Indeed, "[a] ruling concerning the legal sufficiency of the complaint is an appropriate determination to

make in response to a motion to dismiss." *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 924 (7th Cir. 1995) (citing *Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1039 (7th Cir. 1987)). Moreover, "a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949). In addition, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## DISCUSSION

Defendants assert that plaintiffs have failed to state a claim upon which relief may be granted in Counts I and II. The complaint alleges three principal and somewhat overlapping claims. The first contends that the defendants violated § 404 of ERISA, 29 U.S.C. § 1104, by failing to prudently and loyally manage assets held by the Plan. The second alleges that the defendants violated § 404 of ERISA, 29 U.S.C. § 1104 by failing to provide complete and accurate information to the participants in the Plan. The third alleges that defendants M&I and Kuester failed to properly appoint, monitor, and inform the other fiduciaries of the Plan. Lastly, plaintiffs also state claims for co-fiduciary breach.

### I.    Imprudent Management of Assets Claim

The plaintiffs' first claim is that all the defendants breached their fiduciary duties by offering the M&I Stock Fund as one of the Plan's investment options and

by continuing to invest Plan assets in the Fund and Fund assets in M&I common stock when they knew or should have known, in light of the company's financial circumstances, that it was imprudent to do so.

As fiduciaries, defendants were required to take steps to protect the Plan from investments that had become imprudent. *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006). Section 404 of ERISA imposes a "prudent man" standard of care on plan fiduciaries. Fiduciaries discharge their obligations to plan participants by acting "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). Section 404 also imposes a duty to diversify investments, 29 U.S.C. § 1104(a)(1)(C), but the defendants were exempt from this obligation because the Plan required that an available investment option be a fund consisting of entirely M&I stock – the M&I Stock Fund. 29 U.S.C. § 1104(a)(2). Yet, even when a plan requires an employer to offer its own stock as an investment option for employees, and despite the exemption from diversification for such plans, there are still situations in which ERISA's duty of prudence could require diversification of an ESOP's holdings. *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008); *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006); *see Steinman v. Hicks*, 352 F.3d 1101 (7th Cir. 2003).

## A.    The Presumption of Prudence

In the ESOP context, courts apply a presumption of prudence (known as the *Moench* presumption) where the Plan requires the fiduciary to invest in company stock. *Howell v. Motorola, Inc.*, 633 F.3d 552, 568 (7th Cir. 2011); *Summers v. State Bank & Trust Co.*, 453 F.3d at; *Moench v. Robertson*, 62 F.3d 553, 571-72 (3d Cir. 1995).[4]    The *Moench* presumption's purpose is to prevent a fiduciary from the predicament of choosing between violating the plan agreement or violating the fiduciary's duty of prudence. *Moench*, 62 F.3d at 568-69.  A plaintiff may overcome the presumption only in limited situations, by showing that a prudent fiduciary "could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." *Pugh v. Tribune Co.*, 521 F.3d at 701 (quoting

---

[4]Plaintiffs appear to argue that the presumption does not apply in this case because the fiduciaries exercised no discretion.  They premise this argument on the fact that the Plan required the fiduciaries to offer the M&I Stock Fund as an investment option.  They further argue that the plan drafters' statement of intent in § 16.02(f) is essentially a *per se* prohibition against diversification of an ESOP, and thus, the fiduciaries exercised no discretion with respect to this Plan function as well. However, accepting that the fiduciaries had no discretion to eliminate the Fund from among the investment options offered to Plan participants and no discretion to divest the Fund of M&I stock, would mean the court might be obliged to dismiss plaintiffs' breach of fiduciary duty claims because the defendants were arguably not acting as fiduciaries.  Whether an individual was "acting as a fiduciary" depends on whether the individual had discretion over the plan function in question. *See* 29 U.S.C. § 1002(21)(A); *Pegram v. Herdrich,* 530 U.S. 211, 225-26 (2000). Therefore, under plaintiffs' theory, defendants had no discretion whatsoever to eliminate M&I stock as an investment option or to divest M&I stock from the Fund, and so defendants were not acting as fiduciaries, *Pegram,* 530 U.S. at 226, to the extent that they maintained M&I stock as an investment option and continued investment of the Fund in M&I stock. As such, not only would the presumption of prudence not apply, but plaintiffs' breach of fiduciary duty claims would also fail to state a claim upon which relief can be granted. However, because the Seventh Circuit has indicated that the duty of prudence may become a duty to diversify in some contexts, *see Steinman v. Hicks*, 352 F.3d at 1106, the court will apply the presumption in this case.

*Summers*, 453 F.3d at 410). A plaintiff must demonstrate more than that the employer's stock did not perform well or that investment in company stock entailed a high degree of risk. *Howell v. Motorola*, *Inc.*, 633 F.3d at 568-69 (citing *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) ("[m]ere stock fluctuations, even those that trend down significantly, are insufficient to establish the requisite imprudence . . .")).

In this case, the parties disagree over what exactly is required before a fiduciary of an ESOP can disregard the plan's terms and divest the company stock. Plaintiffs contend that although *Moench* set out an example of impending collapse, less is required. The Seventh Circuit has not specified a bright-line standard, though it has made clear that impending collapse would be sufficient. *See Howell v. Motorola, Inc.*, 633 F.3d at 569. Furthermore, the Seventh Circuit has provided some examples of what circumstances, outside of impending collapse, might require a prudent fiduciary to divest company stock. *See Steinman,* 352 F.3d at 1106.[5]

_____

[5]In *Steinman*, the court hypothesized that there may be some circumstances where, even if the fiduciary did not foresee the company's "impending collapse," the fiduciary might still be required, in the interest of the participants, either to diversify the plan's stockholdings or to exchange the company stock for some other less risky investment. 352 F.2d at 1106. The court gave the following example: if the "ESOP was [the employees'] principal retirement asset...and was entirely invested in the stock of their employer..., and their employer was bought in a stock-for-stock deal-so that all the assets of the ESOP became stock in the acquirer by a company that had a much higher debt-equity ratio than their (former) employer and as a result its stock price was much more volatile and its bankruptcy risk greater." *Id.* Additionally, the court in *Summers* described the point at which fiduciaries would be required to divest company stock as "the point at which an increase in the riskiness of the assets, had it been foreseen, would have induced the creators of the ESOP either to have not created it at all or to have required at least partial diversification." 453 F.3d at 410. Thus, the court recognizes that there may be other circumstances, outside of a company's impending collapse, that may overcome the presumption. However, it is clear that a situation creating extreme risk for the company and the plan participants is necessary.

However, this is not a case in which the Fund was the employees' principal retirement asset. Indeed, the existence of twenty-one other investment options and the fact that participants could invest no more than 30% of their Plan assets in the M&I Stock Fund offers assurance that the Plan was adequately diversified and "no participant's retirement portfolio could be held hostage to [M&I]'s fortunes." *Howell v. Motorola, Inc.*, 633 F.3d at 569. Thus, to overcome the presumption in this case, the plaintiffs' complaint must demonstrate either an excessive risk of impending collapse or some other equivalent dire circumstances.

While the presumption serves as a substantial shield on its own, the defendants argue that the evidence needed to rebut the presumption in this case is even more substantial than it might otherwise be because the plaintiffs' burden "varies directly with the strength of a plan's requirement that fiduciaries invest in employer stock." *Quan v. Computer Sciences Corp.*, 623 F.3d 870, 883 (9th Cir. 2010). Here, the drafters not only required that the M&I Stock Fund be offered and that it exclusively invest in M&I common stock, but the drafters' intent, as expressed in §16.02(f) of the Plan, indicated that "there can be no change in circumstances or event (no matter how dire) which would allow the [fiduciaries] to shift investment of the M&I fund into investments other than M&I stock." This articulation of intent becomes quite clever when considering the *Moench* presumption may only be overcome by inquiring into what the plan drafters intended. *See Pugh v. Tribune Co.*, 521 F.3d at 701 (quoting *Summers*, 453 F.3d at 410) (holding that to overcome the

presumption a plaintiff must demonstrate that a prudent fiduciary "could not have reasonably believed that the *plan's drafters would have intended* under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities.") (emphasis added). Thus, according to defendants' logic, because the plan drafters envisioned no set of circumstances which would justify divesting the Fund of M&I stock, a prudent fiduciary could always reasonably believe, even when faced with dire financial circumstances or the threatened viability of M&I, that the plan's drafters would have intended that the fiduciary continue to comply with the ESOP's requirement to exclusively invest in employer securities. As such, plaintiffs' burden to overcome the presumption becomes exceedingly difficult – if not impossible.

The court is hesitant to subscribe to the defendants' theory described above – at least at this juncture in the proceedings – because provisions such as § 16.02(f), if used to heighten the presumption of prudence, may serve as a loophole through which fiduciaries could escape the duty of prudence altogether. The only support for this theory cited by defendants is a case from the Ninth Circuit, *Quan v. Computer Sciences Corp.*, 623 F.3d at 883. Thus, the case is not directly authoritative, and indeed, it discusses the presumption and the amount of evidence needed to overcome it in the summary judgment context, not at the motion to dismiss stage. *Id.* Furthermore, in that case, the court was not faced with the type of provision at issue here – a provision clearly indicating that the drafters' intention

was for the fiduciaries to maintain investment of M&I stock even in the face of the company's imminent downfall. *Id.* Thus, without further authoritative guidance, the court declines to adopt the defendant's theory. In any event, this determination makes little difference in the case at hand, as the court has concluded that plaintiffs' allegations are not sufficient to meet their already substantial burden under the presumption of prudence.

**B.    Plaintiffs' Allegations Fail to Overcome the Presumption**

The defendants argue that, apart from the conclusory allegation that M&I's financial circumstances were "dire," the complaint alleges no facts plausibly suggesting that M&I's viability as a going concern was threatened or any other exceptional facts that are sufficient to overcome the presumption. The defendants further contend that the complaint merely recites, with the benefit of hindsight, the decline in M&I's financial ratings and stock price during the recent financial crisis. In short, the defendants assert that plaintiffs fail to state a claim because the mere allegation of a stock price decline, even a substantial one, does not prove that M&I stock was an imprudent investment and, more importantly, does not rebut the *Moench* presumption for purposes of the motion to dismiss. On the other hand, plaintiffs argue their allegations are sufficient because they detail how and why each defendant knew or should have known that investment in the Fund was imprudent.

To support their assertion that defendants knew or should have known that investment in the M&I Stock Fund during the Class Period was an imprudent

decision, the plaintiffs' consolidated complaint details the allegedly excessively risky business practices of M&I. According to plaintiffs, M&I has been a traditionally risk-averse Wisconsin bank, but strayed "from its core competencies into riskier regions," through its acquisitions in 2005 and 2006 of subsidiary banks in Florida and Arizona, which gave M&I a "significant presence" in these markets. (Compl. ¶¶ 76, 78, 95, 103, 139, 143). Plaintiffs allege that the acquired Florida and Arizona banks held residential and commercial real estate loans in their respective markets. (Compl. ¶¶ 76, 78, 84, 95-96, 139, 143). Plaintiffs further allege that these acquisitions led to M&I's making of "risky loans" and impaired M&I's reputation for "solid loans." (Compl. ¶¶ 139, 143).

Furthermore, the complaint alleges that, despite M&I's loan-loss provisions that grew by approximately 40% (from $13 million to $18 million in the fourth quarter of 2005), coupled with a 17% increase in non-performing assets – allegedly attributable to weakness in both commercial and residential real estate – the company continued with its expansion into these purportedly riskier markets. (Compl. ¶ 77). Plaintiffs next allege that these Florida and Arizona loans eventually resulted in "significant net loss and credit-quality deteriorations," repeated debt and equity downgrades, and "serious concerns" about "capital levels" and "ever-increasing reserves." (Compl. ¶¶ 138-39). The complaint then alleges that despite the company publicly stressing that it would not need to raise capital or cut its dividends (Compl. ¶ 93), M&I eventually took both such actions during the Class Period, cutting

its dividend to 1 cent per share from 32 cents per share and raising $1.7 billion from the government through the Troubled Asset Relief Program, or TARP, and $775 million in private equity. (Compl. ¶¶ 105, 107, 126, 166). Plaintiffs also allege that the company faced six consecutive quarterly losses, lasting until the end of the Class Period (Compl. ¶ 135), and that asset quality continued to deteriorate to the point where non-performing loans exceeded 5%, a level labeled by some analysts as toxic and threatening to a company's survival. (Compl. ¶¶ 98-99, 105, 107, 111, 118, 121). Moreover, the complaint asserts that, because of these risks and problems, the company stock price declined during the Class Period by 89%[6] (Compl. ¶ 138) and returns for investing in the Fund were -59.24%, -44.53%, and -24.03% in calendar years 2009, 2008, and 2007 respectively. (Compl. ¶ 74). Plaintiffs assert that these problems created "dire financial circumstances" such that heavy investment of retirement savings in company stock would inevitably result in significant losses to the Plans and participants. (Compl. ¶ 139). Accordingly, plaintiffs allege that the Fund was an imprudent investment and a prudent fiduciary would have made a different investment decision. (Compl. ¶ 143).

While the alleged facts paint a picture of a historically risk-averse company that engaged in an aggressive business strategy only to have that strategy perform poorly and its reputation for having a high-quality loan portfolio undermined, the

---

[6]Defendants contest this calculation, arguing that plaintiffs exaggerated the decline. Defendants assert that the decline was 54% during the class period. (Defs.' Br. in Supp. Mot. Dismiss at 14 n. 4).

complaint does not plausibly suggest that M&I's "viability of a going concern" was ever threatened or that the company's "stock was in danger of becoming essentially worthless." *See Kirschbaum v. Reliant Energy, Inc.,* 526 F.3d 243, 255 (5th Cir. 2008). Nor does the complaint allege other facts sufficient to rebut the *Moench* presumption if proven. Admittedly, M&I's losses were substantial – it faced six quarterly losses during the Class Period. And, M&I's aggressive expansion into states dogged by the housing slump certainly caused the company's stock price to plummet and increased the company's non-performing loans to a particularly high level. However, the only allegation that even hints at the threatened viability of M&I is the allegation concerning the company's non-performing loans as mentioned in a Bloomberg News report. The report noted that M&I was among 150 banks that owned non-performing loans that equaled 5% or more of the lender's holdings and that this was a level that "former regulators say can wipe out a bank's equity and threaten its survival." (Compl. ¶ 121). It is significant to note that this news report does not state that M&I's survival was threatened, but merely that it owned a percentage of non-performing loans that had the potential to threaten its survival. In any event, this is the only allegation in the extensive consolidated complaint that even comes close to suggesting that M&I was on the verge of collapse.

On the other hand, the majority of plaintiffs' allegations concerning analysts' downgrades of M&I stock demonstrate that the company stock was not worthless and that M&I was not facing an impending collapse. For example, several of the

analysts cited in the consolidated complaint rated M&I at "neutral" or "market perform" during the Class Period. (Compl. ¶¶ 85, 97, 114, 136). Additionally, the complaint alleges that on July 3, 2008, Fitch Ratings downgraded M&I's Individual rating to "B" and its short-term Issuer Default Rating ("IDR") to "F1." However, according to http://www.fitchratings.com, "B" means "[a] strong bank. There are no major concerns regarding the bank." (last visited June 21, 2011). Furthermore, the "F1" rating means "[h]ighest short-term credit quality." http://www.fitchratings.com (last visited June 21, 2011). Furthermore, while Fitch Ratings put M&I on "Rating Watch Negative," the report also noted that "the negative watch reflects the continued uncertainty in [M&I's construction and land development loan portfolio] as well as increased potential for problems in other portfolios as the economy worsens. If problems intensify or if the company does not return to profitability in the near term, further rating actions could occur." (Compl. ¶ 95). Thus, these ratings are not as severe as the plaintiffs portray them to be. Likewise, the complaint refers to M&I's IDR rating in April of 2009 being lowered to BBB+, but again, that rating does not suggest that M&I's survival was threatened. Indeed, a BBB+ rating applies to banks with "good credit quality . . . expectations for default risk are currently low." http://www.fitchratings.com (last visited June 21, 2011). Therefore, while the company's risky lending practices depressed both M&I's stock prices and its ratings, the plaintiffs' complaint actually demonstrates that the stock was not worthless nor was the company on the brink of collapse. Accordingly, the court finds that the

plaintiffs have not alleged facts that, if proven, would rebut the *Moench* presumption and, thus, the plaintiffs' breach of fiduciary duty claim in this respect must be dismissed.

## II.    Failure to Disclose/Misrepresentation Claims

Plaintiffs have also claimed that defendants breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding M&I's true financial condition and future outlook. (Compl. ¶¶ 74, 139, 152). Specifically, plaintiffs assert that the fiduciary communications sent to the Plan participants "did not adequately explain the risk and return profile of the Fund." (Compl. ¶ 139).   Plaintiffs further contend that defendants "fostered a positive attitude toward M&I's stock." (Compl. ¶ 152).  Additionally, plaintiffs assert that M&I's SEC filings, as incorporated into the Plan's Summary Plan Description, "negligently omitted to disclose material information concerning the company's business, operations, regulatory compliance and prospects" including that:  (1) M&I had strayed far from its core competencies into riskier regions and made risky loans in an attempt to increase profits; (2) M&I was experiencing significant net loss and credit-quality deteriorations; (3) there were serious undisclosed concerns about M&I's capital levels and seemingly ever-increasing reserves during the Class Period; (4) the Company lacked a reasonable basis for its positive statements about its lending, business, operations, and earnings prospects; and (5) the Company's long-developed reputation for making solid loans suffered significantly as a result of M&I's

imprudent lending practices. (Compl. ¶ 139).  As a result of these misrepresentations and omissions, plaintiffs contend M&I's common stock became artificially inflated and participants in the plan could not appreciate the true risks presented by investment in company stock and, thus, could not make informed decisions regarding their investments in the Plan. (Compl. ¶¶ 74, 152).

In the Seventh Circuit, a breach of fiduciary duty exists only if fiduciaries "mislead plan participants or misrepresent the terms or administration of a plan." *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 640-641 (7th Cir. 2004) (quoting *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)).  Not all mistakes or omissions in conveying information constitute a breach of fiduciary duty. *Id.* However, material facts affecting the interests of plan participants and beneficiaries must be disclosed. *Tegtmeir v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004).  A violation of ERISA's disclosure requirement requires evidence of either "an intentionally misleading statement, or a material omission where the fiduciary's silence can be construed as misleading. *Howell v. Motorola, Inc.*, 633 F.3d at 571 (citing *Hecker v. Deere & Co.*, 556 F.3d at 585). The Seventh Circuit does not recognize merely negligent misrepresentations or omissions as a violation of ERISA.  *Id.*; *Vallone*, 375 F.3d at 640 ("[W]hile there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable."); *Patten v. N. Trust Co.*, 2010 WL 894050, at *10 (N.D.Ill. Mar. 9, 2010) ("[n]egligent omission . . . is not actionable"). The fiduciary "must have

set out to disadvantage or deceive its employees ... in order for a breach of fiduciary duty to be made out." *Vallone*, 375 F.3d at 640. While a fiduciary's negligence in misleading plan participants or misrepresenting the terms or administration of a plan is not actionable itself, "the failure to take reasonable steps to head off such misrepresentations [and omissions] can be actionable.'" *Howell v. Motorola, Inc.*, 633 F.3d at 571-72 (quoting *Kenseth v. Dean Health Plan, Inc.,* 610 F.3d 452, 470–71 (7th Cir. 2010)).

Plaintiffs' complaint is hardly a model of clarity with respect to its misrepresentation/omission claims. Indeed, it is difficult to ascertain which of its allegations refer to misrepresentations and which refer to omissions. What is clear, however, is that all of plaintiffs' claims in this respect fail for one obvious reason: plaintiffs have not plausibly alleged that the defendants made intentional misrepresentations or omitted to disclose material information with the purpose of misleading the Plan participants. Indeed, the complaint actually alleges the opposite – that is, the fiduciaries negligently misrepresented and failed to disclose material information. For instance, the complaint claims that defendants "should have known of the material misrepresentations and omissions . . ." (Compl. ¶ 141), not that defendants deliberately made misrepresentations or omissions with the intent to

deceive.[7]  Because plaintiffs have not plausibly alleged facts suggesting any misrepresentation or omission was intentional or deliberately misleading, the plaintiffs' claims for breach of fiduciary duty for failure to provide complete and accurate information to the Plan participants must be dismissed.

## A.    Misrepresentation Claims

Plaintiffs' negligent misrepresentation theory also fails for the further reason that the complaint merely sets forth conclusory allegations that do not state a claim for relief. For example, plaintiffs' overarching allegations of misrepresentation are that defendants failed "to provide complete and accurate information regarding [M&I]'s true financial condition," and failed to convey accurate information regarding M&I's "future outlook." (Compl. ¶ 152). Yet, the complaint neglects to identify any language that is materially misleading.  A detailed review of the complaint and plaintiffs' allegations reveals only  three statements about M&I's actual performance or future  outlook that are criticized by plaintiffs.

First, plaintiffs claim that M&I's January 16, 2007 report of its profits was somehow misleading or false because "these profits were largely illusory and, in fact, began to show cause for concern." (Compl. ¶ 79).  Plaintiffs attempt to support this allegation by claiming that in the same quarter M&I also posted increases in non-

---

[7]Moreover, plaintiffs spend much of their response brief arguing that a negligent misrepresentation is actionable, (Pls.' Resp. Br. at 15-16). And, plaintiffs clarify their omission claims stating explicitly that M&I's SEC filings, as incorporated in the Plan's Summary Plan Description, "negligently omitted to disclose material information concerning the company's business, operations, regulatory compliance, and prospects. (Pls.' Resp. Br. at 18).

performing loans and increases in its loan-loss provisions. (Compl. ¶ 79). Yet, simply because M&I posted increases in non-performing loans and increased its loan-loss provisions does not render M&I's profit report misleading. Indeed, by posting these increases, M&I was being anything but misleading. Accordingly, plaintiffs' assertion that M&I's profit report was illusory is itself illusory and, thus, plaintiffs have failed to state a claim in this respect.

Next, plaintiffs' allegations of misrepresentation regarding M&I's July 2008 report of a "strong capital position" are similarly without merit. (Compl. ¶ 93). According to plaintiffs, in July 2008, M&I's CEO stated "[w]e are disappointed with a loss in the second quarter . . . . [but] fortunate that our strong capital position allows us to increase our reserves without cutting our dividend or engaging in a dilutive capital raising transaction." (Compl. ¶ 93). Plaintiffs then allege that this statement about M&I's "strong capital position" was illusory because the company would need to slash dividends and raise capital in the future. (Compl. ¶ 93). While it may be true that M&I ultimately slashed dividends and raised capital, this by no means suggests that, at the time the statement was made, M&I's CEO did not reasonably believe that such action would be unnecessary. Plaintiffs' allegation in this respect is nothing more than a hindsight view of M&I's prior statements. The plaintiffs may not support their allegations in this way and, therefore, their misrepresentation claim based on this statement fails to state a claim.

Lastly, the only specific statement found in plaintiffs' complaint relating to the company's "future outlook" is a July 16, 2008 statement by M&I's CFO that "[w]e feel very confident that we'll return to profitability in the third quarter and the fourth quarter." (Compl. ¶ 98). The only support plaintiff offers to suggest this statement was misleading was that "in reality, the company had not done nearly enough to account for its bad debt and the company's chances of near-term profitability were practically non-existent." (Compl. ¶ 99). Yet, this supporting allegation is both conclusory and predicated on a hindsight review of developments that occurred months later, after the bottom fell out of the subprime mortgage market. Moreover, the CFO's statement was not made in a fiduciary capacity. First, the CFO is not an alleged fiduciary of the Plan and, even if he was, he made the statement during a quarterly earnings call that was neither directed at Plan participants nor incorporated by reference into Plan documents. (Compl. ¶ 98). Accordingly, it cannot be the basis for an ERISA claim. *See In re General Growth Properties, Inc.*, 2010 WL 1840245 (N.D.Ill. May 6, 2010) (dismissing misrepresentation claim and finding that conference calls "expressing optimism and confidence in the Company's financial situation" were in no way connected to plan benefits).

In their response brief, plaintiffs also appear to make two further misrepresentation claims that are nowhere to be found in the complaint. First, they assert that the Summary Plan Description ("SPD") misled participants about the defendants' fiduciary duties with respect to the Fund. (Pls.' Resp. Br. at 20).

Specifically, the plaintiffs contend it was misleading for the SPD to represent that defendants were responsible for all Plan assets when the defendants are now attempting to avoid their duties with regard to the M&I Stock Fund through § 16.02(f)'s "exculpatory language." (*Id.*). First, the court has clarified that, while defendants may have been exempt from the duty to diversify the Fund, their fiduciary duty of prudence still applied and may have required, in certain circumstances, that the fiduciaries divest the M&I stock. To the extent plaintiffs are arguing that the SPD language was inaccurate because it did not also tell participants that the Fund was a required investment option, the court finds that the plaintiffs have not alleged how this omission was misleading or material. Furthermore, even if such a misrepresentation or omission could be said to be intentionally misleading, the plaintiffs have not shown any causal connection between the misrepresentation and the losses to the Plan. As such, this new claim must also be dismissed. Second, plaintiffs contend that the M&I Stock Fund goal set out in the SPD – to achieve "long term growth through dividends and share price appreciation" – was not achievable and unrealistic during the Class Period. (Pls.' Resp. Br. at 19-20). Again, plaintiffs have not alleged that this statement was intentionally misleading, and the fact that the statement was a Fund goal – rather than a guarantee – for long-term growth, not short-term growth, belies the plausibility of plaintiffs' claim. Accordingly, the court finds that this claim must also be dismissed.

### B. Omission Claims

Additionally, plaintiffs assert that the defendants breached their fiduciary duties because M&I's SEC filings, as incorporated into the Plan's SPD, omitted to disclose the following information: "(1) M&I had strayed far from its core competencies into riskier regions and M&I made risky loans in an attempt to increase profits; (2) M&I was experiencing significant net loss and credit-quality deteriorations; (3) there were serious undisclosed concerns about M&I's capital levels and seemingly ever-increasing reserves during the Class Period; (4) the Company lacked a reasonable basis for its positive statements about its lending, business, operations, and earnings prospects; and (5) the company's long-developed reputation for making solid loans suffered significantly as a result of M&I's imprudent lending practices." (Compl. ¶ 139).[8]   Initially, the court notes that the fourth claim appears to be less of an omission claim and more of a misrepresentation claim as it refers to *statements* being made for which M&I lacked a reasonable basis.  Yet, no matter how the allegation is construed, the plaintiffs have failed to point to any specific statement lacking a reasonable basis. Furthermore, the claim is entirely conclusory.  Plaintiffs' fifth omission claim is equally problematic.  Plaintiffs have not identified what about M&I's reputation should have been disclosed or how the defendant company's reputation – which is

---

[8]While plaintiffs' complaint lacks clarity concerning which of its allegations refer to misrepresentations and which refer to omissions, plaintiffs have attempted to clarify their disclosure allegations in their response brief.  The plaintiffs have noted that these five allegations refer to the defendants' alleged omissions. (Pls.' Resp. Br. at 18).

determined by public opinion – could be concealed. As such, the claim is both nonsensical and conclusory.

Next, plaintiffs' first omission claim is also deficient for several reasons. First, the alleged omission relates to business decisions of M&I. While fiduciaries have a duty to disclose material information, *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 807 (7th Cir. 2009), there is no support for the view that Plan fiduciaries were required to provide information about M&I's business decisions in real time to plaintiffs during the Class Period. *See Howell v. Motorola, Inc.*, 633 F.3d at 572 (finding Plan fiduciaries were not "required to provide all information about Motorola's business decisions in real time to Plan participants; and the fact that the [subject business deal] was a bad business decision" was not enough to make the omission of information a violation of ERISA). Thus, simply because M&I's business strategy of expanding into the Florida and Arizona commercial and residential real estate markets turned out to be a mistake, does not mean M&I was either required to disclose this information or that the omission of such information was a violation of ERISA. Additionally, as noted by defendants, plaintiffs' claim confuses disclosure of facts with disclosure of pejorative characterizations about those facts. For example, plaintiffs allege that M&I did not adequately explain that it had "strayed far from its core competencies into riskier regions." Yet, while M&I may not have used the same descriptive language as plaintiffs used in their consolidated complaint, M&I disclosed the facts underlying this claim. First, M&I disclosed in every quarter during the Class

Period that its "overall strategy is to drive earnings per share growth by: (1) expanding banking operations not only in Wisconsin but also into faster growing regions beyond Wisconsin." (*See e.g.* Potter Decl. Ex. 10 [June 30, 2006 M&I Quarterly Report SEC Form 10-Q at 27]) (Docket #21-2). M&I also noted that its primary lending areas included Arizona and that the "vast majority of assets acquired from Gold Banc are in entirely new markets" including Florida. (*See* Potter Decl. Ex. 11 [ Sept. 30, 2006 M&I Quarterly Report SEC Form 10-Q at 49]) (Docket #21-3). Accordingly, plaintiffs' claim that the fiduciaries should have revealed M&I had expanded into riskier regions and had made risky loans is deficient as the facts to which plaintiffs' refer, wrapped up in their pejorative terms, were disclosed. The same holds true for several of the plaintiffs' other allegations concerning omissions of the defendants. For example, though M&I never stated it had "serious concerns" about its capital levels and reserves, the company disclosed information relating to its capital levels and reserves in every quarterly and annual report during the Class Period. (*See generally* Potter Decl. Exs. 8, 14-16). In sum, plaintiffs cannot state a claim for breach of fiduciary duty based on nondisclosure by placing a negative gloss on information that was already disclosed.

Furthermore, plaintiffs' overarching omission claim, under which the specific allegations discussed above fall, is that the defendants failed to adequately explain the risk and return profile of the Fund. (Compl. ¶ 139). However, defendants were not required to generally share specific information about investments offered by the

Plan. *See Brieger v. Tellabs, Inc.*, 629 F.Supp.2d 848, 866 (N.D.Ill. 2009); *Lingis v. Motorola Inc.*, 649 F.Supp.2d 861, 866 (N.D.Ill. 2009) ("[W]hile Defendants may have had some obligation to disclose Plan-specific information to beneficiaries, they were under no duty to generally share additional information about any of the various investments . . . offered by the Plan."). "Creating a standard that requires Plan fiduciaries to continuously gather and disclose nonpublic information bearing some relation to the plan sponsor's financial condition would extend [ ] the statutory language [of ERISA] beyond [its] plain meaning." *Lingis*, 649 F.Supp.2d at 866 (internal quotations omitted); *See also Patten v. The Northern Trust Co.*, 703 F.Supp.2d 799 (N.D.Ill. 2010); *In re Citigroup Erisa Litig.*, No. 07-CV-9790, 2009 WL 2762708, at *22 (S.D.N.Y. Aug.31, 2009) ("[I]t is quite another matter to suggest that a fiduciary must volunteer financial information about companies in which participants may invest. That would transform fiduciaries into investment advisors, and [ ] fiduciaries do not have a duty to give investment advice or to opine on the stock's condition.") (internal citations and quotations omitted).

Indeed, courts in this Circuit have consistently expressed concern that broadening the scope of a fiduciary's affirmative obligation to disclose material information in this way may run afoul of insider trading laws. For example, the court in *Howell v. Motorola, Inc.* explained:

> Perhaps the defendants in this litigation did have inside information, but could they use it for plaintiffs' benefit? Plaintiffs' position seems to be that [plan fiduciaries] are obligated to adopt a policy under which employees invest in a stock during periods of good news for the issuer

-27-

but not during periods of bad news. The implication is that someone else (which is to say, investors at large) must bear the loss when bad news is announced, because the [plan participants] will have bailed out. Corporate insiders cannot trade on their own behalf using private information, good or bad.

633 F.3d at 572 (quoting *Rogers v. Baxter International, Inc.* 521 F.3d 702, 706 (7th Cir. 2008)). Thus, it would appear that Plan fiduciaries do not have a clear affirmative duty to inform plan participants about nonpublic corporate developments that might affect the value of employer stock. As such, all of plaintiffs' omissions claims fail for this additional reason.

### III. Breach of the Duty to Properly Appoint, Monitor, and Inform and Co-Fiduciary Breach.

The consolidated complaint also alleges co-fiduciary liability. A fiduciary may be liable for another's breach only if he: (1) participates knowingly in, or undertakes knowingly to conceal, an act or omission that he knows is a breach; (2) fails to follow his fiduciary duties, thereby enabling another fiduciary to commit a breach; or (3) has knowledge of the breach committed by another fiduciary and makes no reasonable efforts to remedy that breach. 29 U.S.C. § 1105(a). However, this claim is predicated on the existence of underlying breaches of fiduciary duty. The court has already held that plaintiffs have failed to state a claim for relief based on breach of fiduciary duty and, therefore, plaintiffs cannot state a claim for co-fiduciary breach. Accordingly, these claims will also be dismissed. Lastly, in Count II of the consolidated complaint, plaintiffs contend that M&I and individual defendant Kuester breached their duty to monitor other fiduciaries of the Plan and to provide them with

accurate information. However, this claim is also predicated on the existence of underlying breaches of fiduciary duty that are meritless.  As such, the court is compelled to dismiss these claims as well. *See, e.g., Pugh,* 521 F.3d at 702.

Finally, the consolidated complaint will be dismissed with prejudice. Though leave to amend should ordinarily be freely given when justice so requires, Fed. R. Civ. P. 15(a)(2), dismissal with prejudice remains within the discretion of the district court. *See James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006).  While plaintiffs requested leave to amend the pleadings in the event the court granted defendants' motion to dismiss, the plaintiffs have failed to propose any amendment, let alone one that would rectify the deficiencies of the consolidated complaint.  Furthermore, the court concludes that an amended complaint would suffer the same fatal flaws as the consolidated complaint and, therefore, the interests of justice do not require allowing plaintiffs the option of amending their pleadings. *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994) (allowing a claim to be dismissed with prejudice if repleading would be futile). Additionally supporting the court's decision to dismiss with prejudice is the fact that this is a consolidated action in which the initial individual complaints were folded into one consolidated complaint.  Thus, plaintiffs have had more than ample opportunity to construct a complaint that states a claim.  Given the discretion of the court in this matter, the court's conclusion that amendment of the pleadings would be entirely futile, and the reasonable opportunity that plaintiffs were afforded to craft a complaint

that stated a claim under ERISA, the court finds the wiser exercise of its discretion would be to dismiss with prejudice.

Accordingly,

**IT IS ORDERED** that defendants' Motion to Dismiss the Consolidated Complaint (Docket #19) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiffs' Consolidated Complaint (Docket #14) be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that defendants' Motion to Strike Jury Demand (Docket #24) be and the same is hereby **DENIED** as moot.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge